(Decided 16th March, 1893.)

---

LAKE ROLAND ELEVATED RAILWAY COMPANY *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE, and ALFRED E. SMYRK, City Commissioner.

*Municipal corporation—Control of Streets—Street railways— Repeal of Ordinance authorizing Railway company to lay Tracks on Street—Compensation.*

The Mayor and City Council of Baltimore cannot abridge its own legislative powers by the passage of an irrevocable ordinance.

An ordinance authorizing a street railway company to lay down double tracks on one of the streets of the city, may be repealed, and the company restricted to the use of a single track, even after the tracks have been laid, when, in the judgment of the City Council, the public safety and convenience, and the proper regulation of the streets require it.

The repealing ordinance having been passed because the City Council thought that it was required by the public safety and convenience, and the proper regulation of the use of the streets, is not subject to supervision or review by the Courts, the considerations for the repeal being within the legislative judgment and discretion of the City Council.

Such repeal gave the railway company no claim for compensation, the tracks having been laid after it had received notice of the

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

Mayor's objections to a double track, and of his purpose to recommend the passage of the repealing ordinance as soon as it could be effected.

APPEAL from the Circuit Court of Baltimore City.

The appeal in this case was taken from a *pro forma* decree of the lower Court (DENNIS, J.,) refusing the injunction asked for, to restrain the city athorities from removing the railway tracks on Lexington street, and dismissing the bill of complaint. The case is stated in the opinion of this Court.

The cause was argued before ALVEY, C. J., ROBINSON, BRYAN, FOWLER, PAGE, McSHERRY, and BRISCOE, J.

*John E. Semmes, Bernard Carter,* and *William A. Fisher,* (with whom were *John N. Steele,* and *Francis K. Carey,* on the brief,) for the appellant.

When the ordinance No. 23 of 1891, was accepted by the company, and the works thereby authorized were begun, a valid contract was entered into between the company and the city acting under the authority for this purpose conferred on it by the State of Maryland, whereby there was vested in said company the irrevocable right of way over the streets mentioned in said ordinance for the purpose of constructing and operating in said streets the double track railway mentioned and described in said ordinance, upon the terms therein mentioned, with no power on the part of the Mayor and City Council, by any subsequent legislation, to affect any substantial right thereby granted, whether such legislation is sought to be supported under the power of the city to regulate the use of the streets, or under any powers which it may have to repeal ordinances passed by it; but with the right still remaining in the Mayor and City Council of Baltimore, either under the full power

and control it had over the streets before the passage of the Act of 1890, ch. 370, or under said Act, to make such regulations in reference to the use of the streets occupied by said railroad, as were proper for the public health or the public convenience, and which were not inconsistent with the essential rights vested in the railway company under its charter, the laws of Maryland, and said ordinance. *People vs. O'Brien, et al.*, 111 *New York*, 1; *New Orleans, &c., Railroad Co. vs. Delamore*, 114 *U. S.*, 501; *New Orleans Gas Co. vs. Louisiana Light Co.*, 115 *U. S.*, 650; *Greenwood vs. Freight Co.*, 105 *U. S.*, 19, 21, 23.

In illustration of the inability of the Mayor and City Council of Baltimore to abrogate or interfere with the right granted by the ordinance of April, 1891, to the company, to construct and maintain the double railway tracks therein mentioned, the Court is reminded of the well settled doctrine recently recognized by it, that except to the extent which the city reserves, in any ordinance authorizing the construction of railway tracks, the power to grant to other companies the right to use its tracks, that right is an exclusive right, and the city cannot grant to any other company the right to use the tracks of the first company. 2 *Dillon on Mun. Corp.*, sec. 727; *Elliott on Roads and Streets, pages* 566, 570, 573; *Jersey City & Bergen R. Co. vs. Jersey City & Hoboken Horse R. Co.*, 20 *N. J. Equity*, 71, 72; *Penn. Railroad Co. vs. Balto. & Ohio Railroad Co.*, 60 *Md.*, 268; *New Orleans, &c., Railroad Co. vs. Delamore*, 114 *U. S.*, 501; *North Balto. Pass. Railway Co. vs. Mayor, &c., of Baltimore, et al.*, 75 *Md.*, 250.

It is well settled that though a municipal corporation may, by virtue of its power to pass ordinances, repeal those ordinances, they can never make that repeal operate retrospectively to disturb private rights vested under it. 1 *Dillon, Mun. Corp.*, sec. 314.

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

And in the case heretofore cited, of the *People vs. O'Brien, et al.*, 111 *N. Y.*, 1, it will be found that there was in force in the State of New York, statutes giving the State the broadest right of repeal of Acts granting corporate rights; and yet, notwithstanding such reservations of the right of repeal, the Court declares that it was not in the power even of the State to divest the rights in the railway tracks and the franchises connected therewith, which have been vested in the company by an ordinance of the city, passed in pursuance of the authority vested in the city under the laws of the State; and indeed it will be found that in all the cases which we have cited, wherein the right substantially to affect rights once granted by a city ordinance to a railway company is denied, there was, as of necessity there must be, the same general right of repeal of ordinances, which is declared in the authorities cited by Judge DILLON in the section above referred to, to exist in every municipal corporation. See the following Maryland authorities: *McMechen vs. M. & C. C. of Balto.*, 2 *Harris & Johnson*, 41, etc.; *Rittenhouse vs. Mayor, &c., of Balto.*, 25 *Md.*, 336; *State, relation of McClellan vs. Graves, et al.*, 19 *Md.*, 373.

See also the following authorities outside of Maryland: *People, ex rel. vs. West Division Railway Co.*, 118 *Ill.*, 113; *Cape May and Schellenger's Landing R. R. Co. vs. City of Cape May*, 35 *N. J. Eq.*, 419; *Hudson Telephone Co. vs. Jersey City*, 49 *N. J. Law*, 303, 305; *Western Paving and Supply Co. vs. The Citizens' Street Railroad Co.*, 128 *Ind.*, 525; *New Jersey vs. Yard*, 95 *U. S.*, 104; *Springfield Railway Co. vs. City of Springfield*, 85 *Mo.*, 674; *Railway Co. vs. City of Asheville*, 109 *N. C.*, 688; *City of Wyandotte vs. Corrigan*, 35 *Kansas*, 21; *City of Burlington vs. Burlington Street Railway Co.*, 49 *Iowa*, 144; *Rio Grande Railroad Co. vs. Brownsville*, 45 *Texas*, 88; *City of New Orleans vs. Telephone and Telegraph Co.*, 40 *La. Annual*, 41; *Brooklyn Central R. R. Co. vs.*

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

*Brooklyn City R. R. Co.,* 32 *Barb.,* 358; *Langdon vs. Mayor, &c., of City of New York,* 93 *N. Y.,* 129; *Mayor, &c., of City of New York vs. Second Avenue R. R. Co.,* 32 *N. Y.,* 261; *City of Des Moines vs. The C., R. I. & P. R. Co.,* 41 *Iowa,* 573; *Railroad Company vs. Richmond,* 96 *U. S.,* 521; *Sioux City Street Railway Co. vs. Sioux City,* 138 *U. S.,* 98.

Our own Court of Appeals has adopted the principles as established in the cases cited, setting forth at the same time the absolute right of the Mayor and City Council over the streets, and their right to grant the use of the same on conditions imposed. *Northern Cent. Railway Co. vs. Mayor, &c., of Baltimore,* 21 *Md.,* 93; *Koch, et al. vs. North Avenue Railway Co.,* 75 *Md.,* 222; *North Balto. Pass. Railway Co. vs. North Avenue Railway Co.,* 75 *Md.,* 233; *North Baltimore Pass. Railway Co. vs. Mayor, &c., of Baltimore, et al.,* 75 *Md.,* 247.

*Thomas G. Hayes, City Counsellor,* and *William S. Bryan, Jr., City Solicitor,* for the appellees.

The Mayor and City Council of Baltimore is invested by the Legislature of Maryland with full power and authority over the streets of the city, both under its general powers and by express grant. *Art.* 4, *secs.* 306, 810, 814, *of the Code of Public Local Laws; Act of* 1890, *ch.* 370; *North Balto. Pass. Railway Co. vs. North Avenue Railway Co.,* 75 *Md.,* 233; *Textor vs. Balto. & Ohio Railroad Co.,* 59 *Md.,* 64. The meaning of the word "power" or "authority" as used in these statutes, means duty and obligation. *County Commissioners of Anne Arundel County vs. Duckett,* 20 *Md.,* 477; *Mayor, &c., of Baltimore vs. Pennington & Harlan,* 15 *Md.,* 17; *Gregg vs. Mayor, &c., of Baltimore,* 56 *Md.,* 274.

It has been decided by Courts of very high authority that the power to *regulate* the use of streets implies the power to prohibit their use under proper circumstances.

*Attorney-General vs. Boston,* 142 *Mass.,* 203; *Commonwealth vs. Stodder,* 2 *Cush.,* 567; *Union Railway Co. vs. Mayor, &c., of Cambridge,* 11 *Allen,* 287, 294.

The power conferred upon the city to give its consent before a railway lays its tracks in any of the streets, carries with it the power to attach conditions and designate an officer to enforce the provisions of the ordinance. *Northern Cent. R. R. Co. vs. Mayor, &c., of Baltimore,* 21 *Md.,* 105.

If the license to use east Lexington street with double tracks, as given by Ordinance No. 23, speaking now only of the contractual relations created by the ordinance, is not a vested right, and for this reason beyond the reserve powers of the city and State, then under the power given the city by the Act of 1892, chap. 112, to amend or repeal Ordinance No. 23, there can be no question as to the power of the city to amend the ordinance in the manner it has done. *Railroad Co. vs. Richmond,* 96 *U. S.,* 521.

Ordinance No. 23, approved April 8th, 1891, was not an irrepealable contract between the City of Baltimore and the North Avenue Company, creating a vested right in the company to the use of east Lexington street with double tracks, but it only conferred on the company an authority, privilege or license to so use said street, repealable at any time by the Mayor and City Council of Baltimore. This proposition is true, independent of the control over the streets by the city under its police power. The grant by the State or city to a railroad company of the privilege of placing its tracks on a public street and using the same for the transit of its cars, does not create a vested right in the company to the use of the streets for such purpose; such a grant is only a privilege which, under the reserved power of the State or city to amend or repeal the grant, may be altered or revoked at the will of the State or city. All rights,

privileges, immunities, derived by a charter or *legislative grant* directly from the State or city, are repealable under the reserved power of the State or city. The fact that the value of the contract is diminished by the repeal, or pledged income lessened, does not invalidate the amendment or repeal. *Shields vs. Ohio*, 95 *U. S.*, 319; *Sinking Fund Cases*, 99 *U. S.*, 700; *Tomlinson vs. Jessup*, 15 *Wall.*, 459; *Peik vs. Chicago, &c., Railway Co.*, 94 *U. S.*, 164; *Railroad Co. vs. Maine*, 96 *U. S.*, 510; *Jackson, Governor, et al. vs. Walsh*, 75 *Md.*, 304, 23 *Atl. Rep.*, 779; *Cooley, Con. Lim.*, 252, 384, (*5th Ed.*); *Railway Co. vs. Philadelphia*, 101 *U. S.*, 528; *Holyoke Co. vs. Lyman*, 15 *Wall.*, 520; *Hamilton Gas Light Co vs. Hamilton City*, 146 *U. S.* 258.

The grant of the use of the public streets to a railroad company conferred by its charter or legislative enactment is such a privilege, which, under the reserved power, may be amended or repealed. Such grants do not create a vested right beyond the reach of subsequent legislation. Even if no reserved power to repeal exists because it is trust property and irrepealable contracts as to it are void. *Greenwood vs. Freight R. Co.*, 105 *U. S.*, 13; *Mayor and Aldermen of Worcester vs. Norwich and Worcester Railroad Co.*, 109 *Mass.*, 103; *Shields vs. Ohio*, 95 *U. S.*, 221; *American Rapid Tel. Co. vs. Hess, et al.*, 125 *N. Y.*, 641, 26 *N. E. Rep.*, 919; *Branson vs. City of Philadelphia*, 47 *Pa. St.*, 329; *Illinois Central R. Co. vs. Illinois*, 146 *U. S.*, 456; *Davis vs. Mayor, &c., of New York*, 14 *N. Y.*, 506; *Milhau vs. Sharp*, 27 *N. Y.*, 611; 2 *Dil. Mun. Corp.*, 715, 716; *Goszler vs. Georgetown*, 6 *Wh.*, 593; *Railroad Co. vs. Richmond*, 96 *U. S.*, 521.

The test as to whether the thing attempted to be repealed or amended is a vested right and not within the reserved powers of the State or city, to repeal or amend, is this: If the right, immunity or privilege sought to

be repealed or amended, is derived directly from the State or city by a charter or legislative grant, then it is subject to control, and may be repealed or amended, and is not a vested right.

The grant of the use of a street to a railroad company does not create a vested right in the use of the street; but the grant may be absolutely repealed at the will of the Legislature. *Greenwood vs. Union Freight Railroad Co.*, 105 *U. S.*, 13; *Hamilton Gas Light Co. vs. Hamilton City*, 146 *U. S.*, 258.

The grant to the North Avenue Company by Ordinance No. 23, of the use of east Lexington street and the other streets named, with two tracks, was in no sense the grant of a franchise, but was a bare license or privilege, without consideration, and not a contract, and the regulation of said license or privilege by Ordinance No. 1, approved November 18th, 1892, was a legitimate exercise of the power to amend and repeal Ordinance No. 23, and "regulate the use of the streets   *   *   *   by railway or other tracks," conferred or delegated, respectively, by Acts 1892, ch. 112, and 1890, ch. 370, upon the Mayor and City Council of Baltimore. *Booth Street Railway Law, sec.* 10; *Chicago City Ry. Co. vs. People, ex rel.*, 73 *Ill.*, 541; *American Rapid Tel. Co. vs. Hess, et al.*, 125 *N. Y.*, 641, 26 *N. E. Rep.*, 919; *North Baltimore Pass. Railway Co. vs. North Ave. Railway Co.*, 75 *Md.*, 233, 23 *Atl. Rep.*, 466; *Cooley Con. Lim.*, 474, (5*th* Ed.); *Jackson County Horse Railroad Co. vs. Interstate Rapid Transit Railroad Co.*, 24 *Fed. Rep.*, 308; *Burns vs. Multnomah R. Co.*, 15 *Fed. Rep.*, 186.

If Ordinance No. 23 created an irrepealable contract between the city and North Avenue Company to the use of the streets of the city, which never could in the future be amended or repealed, and was not a license revocable, and subject to modification when the public necessities required, then the ordinance was *ultra vires* and void.

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

2 *Dil. Mun. Corp., secs.* 715, 716, (4*th Ed.*); *Davis vs. Mayor, &c., of New York,* 14 *N. Y.,* 506; *Milhau vs. Sharp,* 27 *N. Y.,* 611; *Cooley on Con. Lim.,* 252, 253, (5*th Ed.*); *People's R. Co. vs. Memphis R. Co.,* 10 *Wall:,* 38; *North Baltimore Pass. R. Co. vs. North Ave. Ry. Co.,* 75 *Md.,* 233, 23 *Atl. Rep.,* 466; *Illinois Central R. Co.' vs. Illinois,* 146 *U. S.,* 387.

If Ordinance No. 23 was a grant or contract between the city and company, and not a license or privilege to use the streets named, revocable at the pleasure and will of City Council, then it was a contract *sub modo,* which, under the police power of the Mayor and City Council of Baltimore, over its public streets, could be amended or repealed by the city, whenever the safety, convenience, comfort or welfare of the public might require.

"The police power of a State is as broad and plenary as its taxing power, and property within the State is subject to the operations of the former so long as it is within the regulating restrictions of the latter." *Kidd vs. Pearson,* 128 *U. S.,* 1. See also, *Railroad Co. vs. Richmond,* 96 *U. S.,* 521; *Stone vs. Mississippi,* 101 *U. S.,* 814; *Goszler vs. Georgetown,* 6 *Wheat.,* 593; *Butchers' Union Co. vs. Crescent City Co.,* 111 *U. S.,* 746; *Fertilizing Co. vs. Hyde Park,* 97 *U. S.,* 659; *Boston Beer Co. vs. Mass.,* 97 *U. S.,* 25; *Slaughter House Cases,* 10 *Wall.,* 273; *Munn vs. Illinois,* 94 *U. S.,* 164; *Budd vs. New York,* 143 *U. S.,* 517; *New York vs. Squire,* 145 *U. S.,* 191; *Western Union Telegraph Co. vs. Mayor of the City of New York,* 38 *F. R.,* 552; *Electric Imp. Co. vs. San Francisco,* 45 *F. R.,* 593; *Henry vs. Roberts,* 50 *F. R.,* 902; *People, ex rel. N. Y. Elec. Lines Co. vs. Squire,* 107 *N. Y.,* 593, 14 *N. E. Rep.,* 820; *Presbyterian Church vs. City of New York,* 5 *Cow.,* 540; *American Rapid Telegraph Co. vs. Hess, et al.,* 125 *N. Y.,* 641, 26 *N. E. Rep.,* 919; *Thorpe vs. Rutland & Bur. R. R. Co.,* 27 *Vt.,* 149;

*Trenton Horse Railway Co. vs. Trenton,* 53 *N. J. L.,* 132, 20 *Atl. Rep.,* 1076; *Grand Rapids R. Co. vs. Westside Street R. Co.,* 48 *Mich.,* 433, 12 *N. W. Rep.,* 643; *Detroit City Railway Co. vs. Mills,* 85 *Mich.,* 643, 48 *N. W. Rep.,* 1007; *People vs. Ft. Wayne, &c., R. Co.,* 92 *Mich.,* 522, 52 *N. W. Rep.,* 1010; *Detroit vs. Ft. Wayne Railroad Co.,* 51 *N. W. Rep.,* 688, (*Mich.*); *Knoblock vs. Chicago, Milw. & St. Paul Railroad Co.,* 31 *Minn.,* 402, 18 *N. W. Rep.,* 106; *Henderson vs. Ogden City R. R. Co.,* 26 *Pac. Rep.,* 286, (*Utah*); *State vs. Yopp,* 97 *N. C.,* 477, 2 *S. E. Rep.,* 458; *Mayor, &c., of City of Chattanooga vs. Norman,* 20 *S. W. Rep.,* 417, (*Tenn.*); *Barbier vs. Connolly,* 113 *U. S.,* 27; *Booth St. Ry. Law, sec.* 10 *and chap.* 10.

This police power has been delegated by the State to the Mayor and City Council of Baltimore, and extends over all the streets within the limits of the city, and is as full and complete as the power possessed by the State. The public highways or streets are as much subjects of the police power as the public health and morals.    *Art.* 4, *secs.* 29, 721, 806, 810, 814, 819A, *of Code of Pub. Local Laws;* 15 *Amer. and Eng. Ency. of Law,* 1167, *and cases cited; Textor vs. Balto. & Ohio R. R. Co.,* 59 *Md.,* 63; *Henry vs. Roberts,* 50 *F. R.,* 902; 18 *Amer. and Eng. Ency. Law,* 757, *and cases cited; Henderson vs. Ogden City R. R. Co.,* 26 *Pac. Rep.,* 288, (*Utah*); *Mayor, &c., of Chattanooga vs. Norman,* 20 *S. W. Rep.,* 417, (*Tenn.*); *Commissioners of Easton vs. Covey,* 74 *Md.,* 268.

"The right to exercise the (police) power cannot be alienated, surrendered or abridged by the Legislature by any grant, contract or delegation whatever; because it constitutes the exercise of a governmental function, without which it would become powerless to protect the rights which it was expresly designated to accomplish." *People vs. Squire,* 107 *N. Y.,* 593, 14 *N. E. Rep.,* 820. See also, *New York vs. Squire,* 145 *U. S.,* 191; *Stone vs.*

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

*Mississippi*, 101 *U. S.*, 814; *Henderson vs. Ogden City R. R. Co.*, 26 *Pac. Rep.*, 288, (*Utah*); *Railroad Co. vs. Richmond*, 96 *U. S.*, 521.

"The exercise by the State, (or its authorized agent,) at any time, of its police power, can never be construed into a violation of the Federal Constitution, as impairing the obligation of contracts, notwithstanding the effect may be to repeal existing charters, or otherwise invade the terms of legislative engagements." 3 *Am. and Eng. Ency. Law*, 747. See also, *Stone vs. Mississippi*, 101 *U. S.*, 814; *Boyd vs. Alabama*, 94 *U. S.*, 645; *Farmers Loan & T. Co. vs. Stone*, 20 *F. R.*, 274; *Baker vs. City of Boston*, 12 *Pick.*, (*Mass.*), 184; *Thorpe vs. Rut. & Burl. R. R. Co.*, 27 *Vt.*, 149; *Lake View vs. Rose Hill Cemetery Co.*, 70 *Ill.*, 191; *Brown vs. Keener*, 74 *N. C.*, 714; *Pool vs. Trexler*, 76 *N. C.*, 297.

"Common councils and municipal boards and officers clothed with legislative and police powers, cannot either for themselves or their successors, abrogate the authority with which they are invested. *By implication the law creating the public corporation carries that limitation into every charter and franchise granted by it.*" *Booth St. Ry. Law*, sec. 8, *page* 9. See also, *Western Union Tel. Co. vs. Mayor of the City of New York*, 38 *Fed. Rep.*, 552; *People, ex rel. vs. Squire*, 107 *N. Y.*, 593; *Railroad Co. vs. Richmond*, 96 *U. S.*, 521; *Barbier vs. Connolly*, 113 *U. S.*, 27.

The power of the Courts to declare ordinances unreasonable, and therefore void, is limited to ordinances passed under the general, implied or incidental power of the municipal corporation; but not to ordinances passed under an express power of the Legislature, given to the city to "regulate the use of the streets in said city * * * by railway or other tracks," *Act* 1890, *ch.* 370; or to the express power given by the Legislature to repeal or amend the provisions of an existing ordinance. (*Act* 1892, *ch.* 112.)

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

The power conferred by the Act of 1890, ch. 370, is an express power to regulate the laying of railroad tracks in the public streets. Ordinance No. 1, approved November 18th, 1892, is an ordinance passed under this express power, and not subject to judicial control. *Coal Float vs. City of Jeffersonville*, 112 *Ind.*, 15, 13 *N. E. Rep.*, 115; 17 *Am. & Eng. Ency. of Law*, 247, *cases cited;* 1 *Dil. Mun. Corp.*, sec. 319, (3d Ed.); *Mayor, &c., of Balto. vs. Radecke*, 49 *Md.*, 228.

If, however, the Court should hold that Ordinance No. 1 was passed under a general power, and not by reason of express power delegated by the Legislature, and hence, open to the consideration and decision of the Court as to its reasonableness, then the appellees claim that the Court must find its every provision reasonable.

The public necessity of the exercise of the police power in any case is a matter addressed to the discretion of the legislative department, and with which the Courts have nothing to do; but whether a given regulation is a reasonable restriction upon personal rights, is a judicial question. *Tiedeman's Lim. P. Power*, 593–4; *Knobloch vs. Chicago, Milw. & St. Paul Railroad Co.*, 31 *Minn.*, 402, 18 *N. W. Rep.*, 106; *Mayor, &c., of Balto. vs. Radecke*, 49 *Md.*, 217; *Mayor, &c., of City of Chattanooga vs. Norman*, 20 *S. W. Rep.*, 417, (*Tenn.*); *Commissioners of Easton vs. Covey*, 74 *Md.*, 267; 17 *Am. & Eng. Ency. of Law*, 247, *cases cited.*

This principle was announced in *Radecke's Case, supra,* where Judge MILLER said: "It has been well said in reference to such general grants of power that, as to the *degree of necessity* for municipal legislation on subjects committed to their charge, the Mayor and City Council are the *exclusive judges,* while the selection of the means and manner (contributory to the end,) of exercising the powers which they may deem requisite to the accom-

plishment of the objects of which they are made the guardians, is committed to their sound discretion." (*Page* 228.)

The presumption is in favor of the reasonableness of every ordinance, unless the contrary appears on the face of the ordinance, or is established by proper evidence. *Van Hook vs. City of Selma,* 70 *Ala.,* 361; *Trenton Horse R. R. Co. vs. Trenton,* 53 *N. J. L.,* 132; *Mayor, &c., of Balto. vs. Clunet,* 23 *Md.,* 467.

Any ordinance is *reasonable* which has for its purpose the prevention of the multiplying of car tracks on a public street, which would tend to interfere with the use of the street by the general public. This proposition has been affirmed in several Courts of other States. *Grand Rapids Street Railway Co. vs. West Side Street Railway Co.,* 48 *Mich.,* 433; *Detroit City Railway Co. vs. Mills,* 85 *Mich.,* 643; *People vs. Fort Wayne and E. R. Co.,* 92 *Mich.,* 522; *Commonwealth vs. City of Frankfort,* 17 *S. W. Reps.,* 287, (*Ken'y*); *Dubach vs. Hannibal & St. Joseph R. R. Co.,* 89 *Missouri,* 483.

BRYAN, J., delivered the opinion of the Court.

It has been for a long time recognized as the law that the Mayor and City Council of Baltimore have full and complete control over the streets and highways of the city. It had been considered, however, that certain uses could not be made of them without the sanction of an Act of the General Assembly. For this reason the Legislature saw fit to enlarge the corporate powers of the city. The Act of 1890, chapter 370, entitled "An Act * * * giving the Mayor and City Council (of Baltimore) authority to regulate the use of the streets, lanes and alleys of said city by railway or other tracks, &c., &c., &c.," provided as follows: "The Mayor and City Council of Baltimore shall have power to regulate the use of the streets, lanes and alleys in said city

by railway or other tracks, gas or other pipes, telegraph, telephone, electric light or other wires and poles, in, under, over or upon the same, and may require all such wires to be placed under ground, after such reasonable notice as they may prescribe." Under the authority of this Act the City Council passed Ordinance No. 23, approved April 8th, 1891. This ordinance permitted the North Avenue Railway Company to lay down tracks on certain of the streets of Baltimore, including Lexington street from North street westward to Charles street. It also permitted the erection of an elevated railway on a portion of North street. As the City Council had no power to authorize an elevated railway it became necessary to obtain the ratification of this part of the ordinance by the Legislature. The Act of 1892, chapter 112, after reciting that "before the said North Avenue Railway Company of Baltimore City can elevate its tracks on North street as aforesaid, it is required by law that the sanction of the General Assembly of Maryland should be given to said ordinance so far as it relates to said elevation of its tracks," enacted that the ordinance should be ratified and confirmed, and that the ratification should "have the same effect as if the Mayor and City Council of Baltimore, at the time of the passage of said ordinance, had been fully authorized by the General Assembly to pass said ordinance, and to grant each and all of the powers and privileges therein contained; the said Mayor and City Council to have the same power and control hereafter in reference to the enforcement, amendment or repeal of said ordinance as it has or would have in respect to any ordinance passed under its general powers." Ordinance No. 1, approved November 18, 1892, "repealed that portion of Ordinance No. 23 which authorized the double tracks on Lexington street, but permitted the laying of a single track on certain conditions. It must be mentioned

that by due proceedings the Lake Roland Company has been invested with all the rights and franchises of the North Avenue Company.　The tracks have been laid under circumstances which will hereafter be stated.　The question now presented to the Court is whether the City Council had power to pass the ordinance of November 18th, 1892.

Before we proceed to the investigation of this question we must bear in mind that it has been solemnly adjudged by this Court that the Mayor and City Council of Baltimore, cannot abridge its own legislative powers. *State vs. Graves, Collector of Baltimore,* 19 *Md.,* 351; *Rittenhouse vs. Mayor, &c., of Baltimore,* 25 *Md.,* 337. In *State vs. Graves* (just mentioned) the Court refer to the opinion of the learned Judge MARTIN in the Superior Court of Baltimore as "cogent, clear, comprehensive and well sustained by the authorities," and as "*a sound exposition of the law,*" in which it entirely concurs.　In his opinion Judge MARTIN says: "It is clear that the Mayor and City Council has no power by any contract or covenant, or by any ordinance, by-law or resolution, to restrain or abridge its own legislative capacities."　This matter will be considered more fully hereafter; but it is important at present to examine critically these two ordinances, for the purpose of ascertaining whether any circumstances exist which prevent the application of the principle which we have mentioned.　Ordinance No. 23 authorized the construction of double tracks from the intersection of North avenue and McCulloh street over a number of streets to the intersection of North and Lexington streets, and thence on Lexington street to Charles.　It also authorized an elevated railway from the corner of Eager and North to the corner of North and Saratoga.　It was also enacted that the railroad company should be liable to the payment of the park tax, which was imposed by Act of

JANUARY TERM, 1893.        367

Lake Roland Elevated Railway Co. vs. Mayor. &c. of Balto.

Assembly on the horse railway companies, and that it should have the right to propel its cars by electricity, cable or other improved motive power; but that it should not be allowed to use steam motive power on any part of its railway.   It was also enacted that the cars of the company should not travel on any of its tracks lying to the east of Pennsylvania avenue at a greater rate of speed than ten miles an hour, exclusive of stoppages, except while on the elevated track on North street, when the speed might be increased to fifteen miles an hour, and that on its tracks lying to the west of Pennsylvania avenue the speed should not be greater than fifteen miles an hour.   A number of other regulations were made concerning the rate of fare, and the mode in which the tracks should be laid, and the road operated and conducted, and concerning the keeping in repair the portions of pavement between its tracks and two feet on each side of them.   It was very strenuously insisted at the argument that this ordinance was a contract by which the Mayor and City Council were irrevocably bound; and many authorities were quoted and pressed upon the Court for the purpose of sustaining this position.   They have been very carefully and attentively considered with a due sense of the great importance of the question involved.   Among other cases, great reliance was placed on *People vs. O'Brien, et al.,* 111 *New York,* 1; and certainly in that case the Court did hold that the Common Council of the City of New York had granted to the Broadway Surface Railroad Company a right to lay tracks and run cars over Broadway from the Battery to Fifteenth street, which conferred on the railroad company an estate in perpetuity in Broadway, and that the railroad's right was property within the usual and common signification of the word.   But the nature of the transaction between the Common Council of New York and the railroad company was very different from the

one now under consideration. We learn from this opinion that under an amendment to the Constitution of 1874, the right to operate a railroad on the streets of any municipality is regarded as a privilege which should be disposed of for the benefit of the municipality to any one who would pay the highest price for it, and that such privilege may be indefeasibly acquired by contract; and that the payment of a considerable sum of money annually was one of the terms on which the privilege was granted to the Broadway Surface Railroad Company. It is also stated that legislation has sometimes required that these privileges should be sold by auction; and that now by the laws of 1866, it is in all cases obligatory on the municipalities of the State to sell them by auction to the highest bidder. This constitutional amendment wrought a very great change in the power of city governments over their streets, as may readily be seen by an examination of cases decided before the amendment went into effect. In *Davis vs. New York*, 14 *New York*, 506, and in *Milhau vs. Sharp*, 27 *New York*, 611, a grant by the Common Council of New York authorizing the construction of a railway in Broadway was held void. The principle of decision in these cases was that a permanent grant of this kind divested the corporation of New York City of the exclusive control over the street, which had been given to it as a trust for the use of the public, and which it was not competent to relinquish. *New Orleans, &c., Railroad Co. vs. Delamore*, 114 *U. S.*, 510, was also earnestly pressed upon us. In that case it was decided that when the City of New Orleans had granted a right of way over certain streets to a railroad company, it could not afterwards grant a similar right to another railroad company through and over the same streets, and along the same route. In estimating the bearing of this decision on the case before us, we must bear in mind that the City of New Orleans has the power

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

to sell the right of way over its streets for the purposes of a railroad. It was so held in *Brown vs. Duplessis,* 14 *Louisiana Annual Reports,* 842. The decision of the Supreme Court of the United States just quoted held that the right of way being vested in the first grantee, could not be divested by a subsequent grant of the same franchise to another corporation. *New Orleans Gas Company vs. Louisiana Light Co.,* 115 *United States,* 650, was also cited. The Legislature of Louisiana had incorporated a gas light company, and had granted it the exclusive privilege of vending gas lights in the City of New Orleans. The Court held that the charter thus granted was a contract between the State and the corporators, and that its obligations were impaired by an ordinance of the City of New Orleans authorizing another corporation to lay mains and pipes in the streets for the purpose of supplying the public with gas. The differences are very striking between the laws of Maryland and those of New York and Louisiana on the questions decided in the cases cited by the learned counsel. We are at present concerned with the chartered powers belonging to the City of Baltimore. In *State vs. Graves, supra,* the Mayor and City Council had passed an ordinance for widening Holliday street. The assessment of damages and benefits was duly made and confirmed, and the commissioners for opening streets sold the materials in the houses which would be in the bed of Holliday street, when widened, and also sold portions of the lots which would be divided by the opening of the street. The ordinance was afterwards repealed. A purchaser of one of these lots filed a petition for a *mandamus* to compel the city authorities to proceed with the opening of the street in the same manner as if the repealing ordinance had not been passed. The opinion of Judge MARTIN, in the Superior Court of Baltimore, (which was adopted by the Court of Appeals), stated

that as the State had made a delegation of local legislative powers to the city in its political capacity for public purposes, the right to repeal the ordinance, and arrest the improvement at any stage of its progress, necessarily belonged to the city as an incident to its legislative power. He recognized the fact that those who purchased property within the lines of the proposed widening of the street, did so under the promise and expectation that it would be widened, and that they had been materially injured by the repeal of the ordinance. The Court of Appeals in the same case said: "The Mayor and City Council are but trustees of the public; the tenure of their office impressed their ordinances with liability to change. They could not, if they would, pass an irrevocable ordinance. The corporation cannot abridge its own legislative powers." But it also stated that the purchaser might recover damages for any loss sustained by failure of the city to execute its contract. In *Rittenhouse vs. Mayor, &c., of Balto.*, 25 *Md.*, 336, an ordinance had been passed for the erection of an almshouse; and a contract had been made with the city acting through a duly constituted agent for the doing of certain brickmason's work, including the supply of bricks, lime and sand. After some of the work had been done, an ordinance was passed declaring that the public good required the building to be discontinued, and repealing the ordinance which provided for the erection of the almshouse. Rittenhouse brought suit to recover damages for a breach of the contract made with him. This Court drew a clear and well defined distinction between contracts made by a municipal corporation in the character of a property holder, and those which arise out of the powers entrusted to it for public purposes. It may be well to quote the language of the Court on this point: "In considering the rights, powers, and liabilities of public municipal corporations, in respect to contracts made by

them, regard must be had to the subject-matter to which such contracts relate, and the character in which the municipal body acts in making them.    Where the corporation appears in the character of a mere property holder, and enters into a contract with reference to such property as any private citizen or other proprietor might do; or where it engages in an enterprise, not necessarily connected with or growing out of its public capacity, as a part of the local government; there all its rights and liabilities are to be measured and determined by the same rules as govern mere individual persons, or private corporations; and it cannot claim exemption or immunity from the legal liabilities growing out of its contracts by reason of its public municipal character.    The cases of *Bailey vs. The Mayor, &c., of New York*, 3 *Hill*, 531; *Masterton vs. The Mayor, &c., of Brooklyn*, 7 *Hill*, 61, and *The Western Saving Fund Society vs. The City of Philadelphia*, 31 *Pa.*, (7 *Casey*), 175 and 185, are illustrations of this principle.    See also, *Moodalay vs. The East India Company*, 1 *Brown's Ch. R.*, 469.    The same cases recognize a distinction between the rights and liabilities of municipal corporations growing out of contracts made by them, in their private capacity, as property holders, and those which arise out of the exercise of powers entrusted to them in their municipal characters exclusively for public purposes, with regard to which Courts have no power to review or control their acts, unless they transcend the limits of their delegated powers.    In the case of *The Presbyterian Church vs. The Mayor, &c., of New York*, 5 *Cowen*, 538, which was an action by the church against the city upon a covenant for quiet enjoyment, the corporation had conveyed lands to the plaintiff for the purpose of a church and cemetery, with a covenant for quiet enjoyment; afterwards the corporation, in the exercise of a power delegated to it by an Act of the Legislature, passed a

by-law prohibiting the use of the lands as a cemetery. It was held, that this was not a breach of the covenant which entitled the plaintiff to damages, but was a repeal of the covenant. It was held, that a municipal corporation cannot, by contract, abridge its legislative power." It was also held, that the contractor was entitled to recover any damages which he had actually sustained by reason of the contract while it was operative and in force; but not damages on account of profits which he might have made under the contract, if he had been permitted to go on with the work. It is perfectly well settled that a municipal corporation has a right to abandon any public improvement, and repeal at its pleasure any ordinance providing for the same; and property owners cannot compel it to take and pay for property condemned for such purpose. The right of repeal is unquestionable, but if in the exercise of this undoubted right injury is inflicted upon the property holder, he can recover damages by action at law. It has even been held that an unreasonable delay in repealing the ordinance will give a cause of action if injury ensue; or an unreasonable delay by the city in determining whether it would take the property condemned. *Graff vs. Mayor, &c., of Baltimore,* 10 *Md.,* 544; *Norris, et al. vs. Mayor, &c., of Baltimore,* 44 *Md.,* 606; *Mayor, &c., of Baltimore vs. Musgrave,* 48 *Md.,* 272. In *Newton vs. Commissioners,* 100 *United States,* 548, the Legislature of Ohio had passed an Act establishing the county seat of Mahoning County at Canfield, and providing that before it should be considered permanently established at that place the proprietors or citizens thereof should give bond with sufficient security payable to the commissioners of the new county, thereafter to be elected, for the sum of five thousand dollars to be applied in the erection of public buildings for the county, and that the citizens of Canfield should also donate a suitable lot of ground for the

erection of public buildings.   The bond was given as required, a suitable lot of ground was conveyed to the county, and the citizens at a cost of more than ten thousand dollars erected on the lot a commodious Court house suitable for the transaction of the public business, which the commissioners accepted in full satisfaction of the bond, and as a full compliance with the Act; and thenceforward Canfield became the county seat.   Nearly thirty years afterward the Legislature passed a statute for the removal of the county seat to Youngstown.   On a petition for an injunction to restrain the County Commissioners from removing the county seat, one of the questions was whether it was competent for the State to enter into such a contract as was alleged to have been made. The Supreme Court held that although there were cases in which a State might lay aside its sovereignty, and contract like an individual and be bound accordingly, it could make no contract and pass no irrepealable law about "governmental subjects."   Speaking of the *Dartmouth College Case* it said:   "The principle there laid down and since maintained in the cases which have followed and been controlled by it, has no application where the statute in question is a *public law* relating to a *public subject* within the domain of the general legislative power of the State, and involving the *public rights* and *public welfare* of the entire community affected by it. The two classes of cases are separated by a broad line of demarcation."   And in a subsequent part of the opinion speaking of legislative acts concerning public interests, the Court said:   "Every succeeding Legislature possesses the same jurisdiction and power with respect to them as its predecessors.   The latter have the same power of repeal and modification which the former had of enactment, neither more nor less.   All occupy in this respect a footing of perfect equality.   This must necessarily be so in the nature of things.   It is vital to the

public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require. A different result would be fraught with evil." In *Illinois Central Railroad Company vs. Illinois*, 146 *U. S.*, 387, the Legislature of Illinois by an Act passed in 1869 had granted to the Illinois Central Railroad Company all the right and title of the State of Illinois to submerged lands constituting the bed of Lake Michigan for the distance of a mile into the lake. It was stipulated that the railroad company should pay to the State seven per cent. of the gross receipts from the use, profits and leases of the lands granted, or the improvements thereon, or that might be made thereon, and that in conjunction with three other railroad companies (to whom grants were made in the same Act) it should pay eight hundred thousand dollars to the City of Chicago, in instalments of two hundred thousand dollars each. The first instalment of two hundred thousand dollars was tendered by the four companies but was refused by the city. The railroad company erected piers and expended a large sum of money in the improvement of the property granted by the Act of the Legislature. In 1873 the Legislature of Illinois repealed the Act making this grant. The question for the Court was whether the repealing Act was valid. It was held to be valid. In the course of its opinion the Supreme Court said: that the ownership of lands lying under the navigable waters of the great lakes, and the dominion and sovereignty over them, resided in the States within whose limits they were included: that a State could not abdicate its general control over such lands; that such abdication was not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public; that this trust could be discharged only by the management and control

of the property, and could not be relinquished by a transfer of it; that the control of the soil and beds of navigable waters was held by the people in trust for their common use, and of common right as an incident to their sovereignty; that the Legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which from the very nature of things must vary with varying circumstances; that every Legislature must at the time of its existence exercise the power of the State in the execution of the trust devolved upon it; and that there could be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust under which he was bound to hold and manage it. The decree was that such portions of the piers erected by the railroad company should be removed as extended beyond the point where the navigable waters of the lake commenced. In 1850 the Legislature of Illinois had given the railroad company a right of way two hundred feet in width, but enacted that it should not make a location of its track within any city without the consent of the Common Council. The Common Council of Chicago in 1852 gave its consent upon certain terms to the construction of the track within the limits of the city, and along the margin of the lake; and the track was located and the road constructed. The case involved no question in reference to the occupation and use of this track, and no question of the kind was decided. We may mention another case which has a bearing on the present one. In *Goszler vs. Georgetown,* 6 *Wheaton,* 593, it appeared that the corporation of Georgetown had passed an ordinance by which it was enacted that a level and graduation which had been made for certain streets should be binding on the corporation, and all other persons whomsoever, and be forever thereafter regarded in making improvements on said streets. The plaintiff owned lots

on one of these streets, and made improvements on them according to the graduation which had been made; and afterward the corporation passed another ordinance directing the level and graduation of this street to be altered. In consequence of this alteration it became necessary to cut down the street in front of the plaintiff's house. The question was whether the repealing ordinance was valid. The Court said: "It cannot be disguised that a promise is held forth to all who should build on the graduated streets, that the graduation should be made unalterable." The repealing ordinance was however held valid. The ground was that the corporation of Georgetown could not make a contract which should operate so as to bind its legislative capacities forever thereafter. *Dillon on Municipal Corporations, sec.* 97, (*4th Ed.*), sums up the doctrine, in these words, and cites a very large number of authorities: "Powers are conferred upon municipal corporations for public purposes; and as their legislative powers cannot, as we have just seen, be delegated, so *they cannot without legislative authority, express or implied, be bargained or bartered away.* Such corporations may make authorized contracts but they have no power, as a party, to make contracts, or pass by-laws which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties." The application of these principles to the present case will be apparent when we have considered with particularity the repealing ordinance, and the circumstances under which it was passed.

The ordinance makes the following recitals: "Whereas, by a provision in section 1 of Ordinance No. 23, approved April 8, 1891, and entitled 'An ordinance to authorize the construction of city passenger railway tracks by the North Avenue Railway Company on North avenue, from

McCulloh street to Guilford avenue, and thence on Guilford avenue and North street to Lexington street, and thence on Lexington street to Charles street, and on North street to the north side of Fayette street,' the North Avenue Railway Company of Baltimore City was authorized and licensed to lay down and construct double iron railway tracks for the purposes of its business on divers streets of the city, among others on Lexington street, between North street and Charles street; and whereas, it appears to the Mayor and City Council of Baltimore, that the public safety and convenience, and the proper regulation of the use of the streets, requires that there shall not be more than one iron railway track laid down, constructed, maintained, or used on said portion of Lexington street; and whereas, the president and other officers of the said North Avenue Railway Company knew, before any expense was incurred by the said company, or before any portion of the work of laying said tracks on said portion of Lexington street had been done, that in the judgment of the Mayor and City Commissioner, the laying of a double set of iron railway tracks on said portion of Lexington street would be detrimental to the public interest; and that the City Solicitor had given the opinion that the Mayor and City Council had full power to alter or revoke the authority given by said section 1 of Ordinance 23, of April 8, 1891, to lay double iron railway tracks on said portion of Lexington street; and that the Mayor would, on the earliest practicable occasion, recommend the passage of an ordinance altering and revoking the authority to lay such double iron railway tracks on said portion of Lexington street.'' Douglass street has recently been opened and extended so as to connect with Lexington, and make a continuous thoroughfare from the western extremity of the city, to a remote point in the eastern part. The cost of this improvement, including paving, will be about six

hundred thousand dollars. There is no street between Lexington and the water on the south which is not obstructed in some part of it by railway tracks; and none nearer than Eager on the north (nine blocks distant) which can be used as a thoroughfare from the western to the eastern part of the city. The City Hall is at the south eastern corner of North and Lexington streets; and on Lexington, between North and Calvert streets, are the fire engine house No. 4, and the office of the Liquor License Board on the north side, and on the south side is the United States Post Office building, in which are the rooms of the United States Court, and the Internal Revenue office. Between Calvert and St. Paul are the Court House of the city (with its principal entrance on Lexington) and the Record Office; and the other buildings between Calvert and Charles are principally used for offices of lawyers and real estate brokers. By measurements, it is shown that the distance between the overhanging sides of the cars and the gutter on the south side of Lexington street, between Charles and Calvert, will vary from four feet seven inches to three feet eight inches; and on the north side it varies from four feet seven inches to three feet four inches; and between Calvert and North streets on the south side the side of the car will project one inch over the outside edge of the gutter; and on the north side it will vary from eight feet two inches to eight feet ten inches. Measurements were also made of different vehicles, ranging from the large furniture van to the small one horse carriage, and it was found that they measured from eight feet four inches for the largest to six feet one inch for the smallest. The maximum rate of speed allowed for the cars on this part of the track is ten miles an hour. The distance from North to Charles street being eleven hundred feet, if the cars run at half the permitted speed, they will pass over this space in two and a half minutes. And it is stated in

the bill of complaint that at certain hours of the day it will be "necessary to run cars on Lexington street at intervals of three or two minutes, and sometimes at an interval of one minute apart." It must be very obvious that the existence of these tracks is incompatible with the use of this part of the street as a drive-way. The control of the city over the streets is attended with the duty of preserving them for their legitimate purposes. They are intended for the passage of the people over them on foot, on horseback and in vehicles on their various occasions of business convenience and pleasure. It is not competent for the city to defeat the primary purposes for which they were dedicated to the public use. They are highways, and must be maintained as highways so long as they are kept in existence. The power over the streets is held on the same trusts as the other legislative powers conferred on the Mayor and City Council. It is intended to be used for the purpose of preserving them in the character of streets in such condition as may be most suitable for the public use. It is of incalculable importance to the public interest, and there can be no more reason to suppose that the city can abridge or surrender this legislative power than any other. In the State of New York where, as we have seen, a railroad company may by the Constitution and statutes acquire an estate in perpetuity in the streets, it is held that statutes authorizing telegraph companies to erect and construct the necessary fixtures for their lines upon public streets could be repealed, after the fixtures had been erected. *American Rapid Telegraph Company vs. Hiss, et al.,* 125 *New York,* 641. We will quote from the opinion of the Court: "The people of the State do not own the streets, and the only authority the Legislature has over them is to deal with them as streets, and to regulate their use as streets for public purposes; and by these Acts it in effect determined that one of the pur-

poses for which the streets could be used, was the erection of poles and stringing of wires for the business of telegraphing, and that that was a public use not inconsistent with the use of the streets for general street purposes. These were general, public legislative Acts in the exercise of the police power of the State; and, therefore, they were not beyond the reach or touch of future legislation. The Legislature did not intend to divest itself, and could not divest itself, of its control over the streets for the public welfare, and we must infer, from the language used, that it did not intend to bind itself by an irrevocable grant. If, therefore, these Acts are to be construed as merely conferring a license which has been acted upon by the plaintiff, the Legislature could revoke the license or modify it in any way, or at any time, when the public interest might require it." If an ordinance cannot be repealed which will reduce Lexington street to the condition which we have described, then truly, the City Council have lost all control over the streets, and have renounced their legislative power. And it will be demonstrated that they have the power to destroy their utility for the legitimate purposes of streets, and to convert them into places of extreme peril to life and limb, but not the power to keep them in a condition suitable for their ordinary use as highways. Our municipal governments were not instituted for the purpose of making any such result possible. The repealing ordinance was passed because, as stated in the preamble, the City Council thought that it was required by "the public safety and convenience, and the proper regulation of the use of the streets." These considerations for the repeal were within their legislative judgment and discretion, and the evidence shows that the ordinance has "a real and substantial relation" to the objects proposed. It is therefore not subject to supervision or review by the Courts. This legislative authority over

the streets delegated to the city is sometimes classified
as belonging to the police power; that is to say, that
great power which embraces the protection of life, limb,
health and property, and the promotion of the public
peace and safety.   It is a high conservative power of the
utmost importance to the existence of good government.
It has been most emphatically declared by the Supreme
Court of the United States on several occasions, that a
State cannot limit its exercise of this power by contract
or in any other way.   Some of the best known and most
striking cases are, *Stone vs. Mississippi.* 101 *United
States,* 814; *Boston Beer Company vs. Massachusetts,* 97
*United States,* 25; and *Fertilizing Company vs. Hyde
Park,* 97 *United States,* 659.   But supposing this desig-
nation not to be appropriate in the present instance, the
name given to the power is of no importance.   It is
expressly conferred by the Legislature.

Although the city had a right to repeal this ordinance,
it would have been obliged to make compensation to the
railroad company if the expense of laying the tracks on
Lexington street had been reasonably incurred in reli-
ance on Ordinance No. 23.   The cases which we have
already cited show the opinion of this Court on this
subject.   But the tracks were laid on Lexington street
after the Mayor's objection to a double track was made
known to the President of the railroad company.   The
work was commenced on the thirty-first of October, but
it was suspended the same day, before the tracks were
located.   On the third of November an interview took
place between the Mayor and the President of the rail-
road company, in which the Mayor stated his objections
to a double track.   The Baltimore *Sun* of the next day
contained a detailed statement of the Mayor's reasons
for his opposition to the double track.   After the inter-
view with the Mayor the work was pressed forward
with extraordinary vigor.   On the seventh of November

the Mayor and City Solicitor each wrote a letter to the President informing him that at the first meeting of the City Council an ordinance would be submitted to prohibit the laying of the double track.   After the receipt of these letters by the President the work of laying the double track was continued night and day without intermission until it was completed.   The general manager of the railroad testified that he did not know that there had ever been any construction work done in the city at night, except what was done on Lexington street.   Lexington street had not been reached in the regular course of the construction of the road.   The elevated structure on North street had not been completed, nor had the tracks been laid on North street, south of Saratoga, and no preparation had been made for laying them.   And at the time the testimony was taken in the cause this elevated structure was not completed, work being in progress at the north end, near Eager street; nor had any preparation been made for laying the tracks on North street, south of Saratoga.   Saratoga is one block north of Lexington, and is the street at which the elevated structure is to terminate at its southern extremity.   We do not see how in any way the city can be held responsible for the expense incurred under these circumstances by the construction of these Lexington street tracks. To say the least, the expense was unnecessarily incurred after full knowledge of the purpose on the part of the Mayor to recommend the passage of the repealing ordinance so soon as it could be effected.   The ordinance was promptly passed as soon as the City Council met.

Considerable comment was made on the rights of way enjoyed by other passenger railway companies, and the supposed unfavorable effect on their interests of a decision in favor of the city.   We may say once for all that we are dealing only with the case before us.   Franchises and privileges granted by the Legislature cannot be an-

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

nulled by an ordinance of the Mayor and City Council. We hold that Ordinance No. 23 did not vest in the Lake Roland Company an irrevocable right in the streets. It is our most solemn duty to protect vested rights; and that duty we mean to perform to the extent of our ability, by the exertion of all the powers conferred upon us by the Constitution and the laws. As to other matters involved, the city's liability for damages, as above declared, will secure justice to those who may have incurred expense on the faith of privileges duly granted.

The bill of complaint in this case prayed for an injunction to restrain the city authorities from removing the tracks on Lexington street. The Circuit Court of Baltimore City passed a *pro forma* decree dismissing the bill with costs. It must be affirmed.

*Decree affirmed,*
*with costs.*

(Decided 16th March, 1893.)


On the 31st of March, 1893, the appellant moved the Court for a re-argument of the foregoing case, and in support of its motion filed an extended and carefully prepared brief. The Court overruled the motion.

Chief Judge ALVEY filed the following separate opinion on the motion for a re-argument :

When this case was originally decided by this Court, I fully concurred in the conclusion arrived at that it was competent to the Mayor and City Council of Baltimore to pass the repealing or restrictive Ordinance, No. 1, approved November 18th, 1892, limiting the appellant company to the use of a single track for its road on Lexington street, between North and Charles streets, and requiring it to remove the double tracks as by the

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

ordinance directed.   And after careful consideration of
the reasons assigned by the appellant for a re-argument
of the case, I remain of my former opinion.

The grounds of my judgment are briefly these.   The
Mayor and City Council, by statutory provision, are
invested with *express* authority " to *regulate the use* of the
streets, lanes and alleys of the city, by *railway or other
tracks,*" and this, as I understand it, is but an amplifi-
cation of their general power over, and right and duty
to regulate and maintain the streets and other highways
of the city for the use of the public.   It is quite clear
that the Act of 1892, ch. 112, has in no manner divested
the Mayor and City Council of their power over the
streets of the city upon which the tracks of the appel-
lant may be laid ; but, on the contrary, that statute is
careful to reserve to the city " the same power and con-
trol *hereafter* in reference to the enforcement, *amendment
or repeal* of said ordinance, as it has or would have in
respect to *any* ordinance passed under its general
powers."   The ordinance referred to in this Act is the
Ordinance No. 23, approved April 8th, 1891, under
which the authority was first obtained from the city to
lay railway tracks on Lexington street, and which was
confirmed by the Act of the General Assembly of 1892,
ch. 112, with the reservation just stated.

The power to maintain and regulate the use of the
streets of the city is a trust for the benefit of the general
public, and the primary use of the streets is not, by any
means, that of furnishing tracks for street railways.
The Mayor and City Council cannot divest themselves of
this trust, nor can they so restrict their power over the
streets as to defeat or seriously impair the beneficial
enjoyment of the streets by the public in the ordinary
and usual modes of passage thereon.   The power vested
in them, in respect to the streets, is of a legislative
character ; and they can neither restrict themselves, nor

their successors, by any irrepealable ordinance, in the exercise of such power over the streets, except it be by the express authority of the Legislature of the State. The power is a continuing one, to be exercised whenever the public needs may require it; and hence the power to regrade and improve the streets from time to time, must remain subject to the judgment and discretion of the legislative branch of the municipal government. But if the contention of the appellant could be maintained, the streets on which railway tracks are once laid, might, and most generally would, pass out of the control of municipal authority. For, however improvident or reckless might be the grant of privileges to street railway companies, or however much their tracks might obstruct the use of the streets by the general public, perpetual easements or servitudes would be created in the streets, and the municipal authorities would be precluded from the exercise of the ordinary power of changing grades, or making other improvements of the street, that might materially interfere with the tracks, or the operation of the road, though public necessity for such improvement might be never so urgent. And, in such case, the only means of reclaiming the street to the absolute control of the city authorities, and to the general public use, would be by a resort to the power of eminent domain. But, in this case, to say nothing of the general indefeasible nature of the legislative power vested in the Mayor and City Council in respect to the streets, the express statutory reservation of the power to regulate the use of the streets by railways, secures to the Mayor and City Council the paramount right at all times to control the street, and to determine that no more than a single track shall be maintained thereon.

I am aware that it may be urged, and, indeed, it has been urged here, and it constitutes the full strength of the appellant's case, that upon the principles that I

have stated as the ground of my judgment, there would be no sufficient protection to the property rights in a street railway. But I am far from saying that such property rights are not entitled to protection. If, in reliance upon a valid ordinance, a railway company, in good faith, and without notice that the authority is about to be modified or withdrawn, has laid its tracks in the street of a city, and the municipal authorities afterwards conclude that the grant of the privilege was improvident, or detrimental to the public, and require the tracks to be removed, this can be enforced only upon principles of fair indemnity to the company. This is in accordance with a well established principle in the case of an executed license, where, to entitle the licensor to revoke the license, and to be restored to his former rights, he must do justice to the licensee, by indemnifying him for the expense which he has reasonably incurred under the license; but not for prospective profits that might be realized. This measure of indemnity the principles of justice would seem to require, in such case as I have just stated. See *Addison vs. Hack*, 2 *Gill*, 221.

The recent case of *St. Louis vs. Western Union Tel. Co.*, 148 *U. S.*, 92, made the ground for the present application for re-argument, is supposed to be quite decisive of this case, in support of the contention of the appellant. That case was decided by the Supreme Court after the argument of this case, and the opinion was not brought to our attention until after the opinion in this case was filed. But, upon careful examination of the opinion of the Supreme Court, as delivered by Mr. Justice BREWER, I fail to perceive in what respect it can be regarded as having any decisive application to this case. That case is not like the present in any material respect. It was a proceeding to enforce the collection of a specific tax or rental assessed under an ordinance of the City of St. Louis, upon each of a number

Lake Roland Elevated Railway Co. *vs.* Mayor, &c. of Balto.

of telegraph poles of the defendant, erected along the streets of the city; and the right to enforce the collection of such **tax** or rental was denied by the defendant company, upon the ground that such tax or rental was a mere privilege or license tax for the privilege of carrying on its business in the city; and that the assessment, and attempted enforcement and collection of such tax, were acts in violation of Art. 1, sec. 8, paragraphs 3 and 7 of the Constitution of the United States. This defence was not sustained by the Court. It is true, the defendant, as an additional defence, contended, that the city, by its ordinance, had contracted with the defendant to permit the erection of certain telegraph poles in the streets of the city, in consideration of the right of the city to occupy and use the top cross-arms of any of such poles for its own telegraph purposes, free of charge. But the Court, upon the facts of the case, refuted that contention; and cited and quoted from certain State decisions, relied on by the defendant, *only* to show that they had no application to the case. I do not find that there was anything *decided* in that case that supports the contention of the appellant here. Nor do I think that the Supreme Court has in any case established a doctrine that supports the contention of the appellant.

I therefore think the motion for re-argument should be overruled.

(Filed 19th April, 1893.)