THE BEAR CREEK FERTILIZER CO. *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*Municipal Corporations—Contract for Removal of Night Soil— Renewal.*

An ordinance of the Mayor and City Council of Baltimore directed the Mayor and other officials to make a contract with a designated party for the removal of night-soil upon certain terms. The ordinance provided that the contract should be "for the term of two years with the privilege of renewal." The contractors were required to give bond and power was reserved to revoke the contract

if not performed to the satisfaction of the Health Department. After the contract was made it was assigned to the plaintiff with the assent of the municipality. The contract was renewed several times and fully performed on the part of the plaintiff, when the Mayor refused to renew it again for another period of two years. *Held*, that so long as the ordinance remained unrepealed by the City Council the plaintiff was entitled to have the contract renewed.

Appeal from a *pro forma* decree of the Circuit Court of Baltimore City dismissing the bill of complaint. The bill prayed for a mandatory injunction directing the Mayor, City Comptroller and Commissioner of Health to execute a contract with the appellant for the removal of night-soil upon the same terms as were contained in the contract made by the city with the appellant in 1895. This contract set forth, among other things, that " whereas by an ordinance approved May 24th, 1880, the said Mayor, Comptroller and Commissioner were authorized and directed in the name of the Mayor and City Council of Baltimore to contract for a term of two years, with the privilege of renewal, with Messrs. R. R. Zell & Co., for the removal of all night-soil gathered in the city of Baltimore. And whereas, in accordance with said ordinance, said Mayor, Comptroller and Commissioner did contract with said R. R. Zell & Co. for the removal of all the night-soil gathered in the city of Baltimore, but said R. R. Zell & Co. having soon thereafter failed in business, said contract was sold at public auction to S. A. Wetzler & Co., and by said S. A. Wetzler & Co. sold, assigned and transferred to the Bear Creek Fertilizing Co. And whereas, the said parties of the second part assented to said sale and transfer, and the said party of the first part has in every respect carried out and fulfilled the terms of said contract. And whereas, said party of the first part has requested the execution of these presents as evidence of said contract for a term of two years, accounting from September first, A. D. 1895, with privilege of renewal, and the said parties of the second part, in the name of the Mayor and City Council of Baltimore, have assented to said renewal by executing these

presents. Now, therefore, in consideration of the premises and of the acceptance of the bid of said The Bear Creek Fertilizing Co. by said Mayor, Comptroller and Health Commissioner, the said party of the first part does hereby contract and agree with the Mayor and City Council of Baltimore to remove in an odorless manner from two points hereinafter designated, all the night-soil delivered to it by the privy excavators of the city of Baltimore, and it does bind itself under a bond in the penalty of ten thousand dollars to comply with the following conditions, to-wit," etc.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE and BOYD, JJ. (Dec. 6, 1897).

*William S. Bryan, Jr.* (with whom were *Robert H. Smith* and *Edward N. Rich* on the brief), for the appellant.

Whether an assignment of the contract provided for by the ordinance could lawfully be made by the original contractor to the appellant without the assent of the corporation of the Mayor and City Council of Baltimore is a question which does not arise in this case. If the question did arise, it would seem that the rights of the assignee would be complete without notice to or assent by the city government or any of its officers. *Horner* v. *Wood*, 23 N. Y. 350, 355; *Devlin* v. *Mayor*, 63 N. Y. 8; *Taylor* v. *Palmer*, 31 Cal. 241; *Ernst* v. *Kunkle*, 5 Ohio St. 520; *Smith* v. *Hubbard*, 85 Tenn. 306; *City of St. Louis* v. *Clemens*, 42 Mo. 69; *Arkansas Smelting Co.* v. *Belden Co.*, 127 U. S. 390. There is no *personal confidence* in a contract to remove night-soil; it makes no difference to the public who removes it, so long as the contract is faithfully performed. If the person removing it should fail to do so properly the city has ample protection in the bond filed, and in the summary power of the Mayor to revoke and annul the contract secured by the fifth section of the ordinance. Mayors

Whyte and Latrobe in making the contracts for renewal with the Bear Creek Co., as assignee of Zell before 1885, evidently acted upon this view of the law. But the passage of the resolution No. 60 of 1885, takes this question out of the case, and makes manifest the assent of the entire municipality (both the Mayor and the City Council) to the assignment to the Bear Creek Co., and also its recognition of the validity of such assignment. A legislative recognition of any right or franchise, when advisedly and clearly made, is equivalent to an original grant of such right or franchise. *Koch* v. *North Ave. Ry. Co.*, 75 Md. 226; *Basshor* v. *Dressell*, 34 Md. 510; *Bow* v. *Allentown*, 34 N. H. 351; *Kanawha Coal Co.'s case*, 7 Blatch. 391.

The learned City Solicitor misconceives our position when he states that the claim of the appellant is "to have enforced *a perpetual contract* with the Mayor and City Council of Baltimore for the removal of night-soil." It is perfectly clear, we admit, that such a contract would not be maintainable. The care for the removal of night-soil from a great city is clearly one of those duties which, relating to the public health, convenience and comfort, fall within the police power. It is very manifest, therefore, that one City Council neither by ordinance nor in any other way, could barter away the power of a succeeding City Council to deal with the problem in their legislative discretion, as the exigency of the public interests might in their judgment demand. No action which the City Council of 1880 might have taken could prevent the City Council of 1897 from dealing with the matter as in their legislative discretion they fairly thought necessary for the conservation of the public interests. *Lake Roland Elevated Railway* v. *Baltimore*, 77 Md. 376; *North Balto. Pass. Railway* v. *Baltimore*, 75 Md. 250; *Rittenhouse* v. *Baltimore*, 25 Md. 336; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; 1 *Dillon on Municipal Corp.*, section 97. And we of course make no such extreme or untenable contention. There is, however, a vast difference between stating that the Bear Creek Co.

has a contract to remove all the night-soil from the city of Baltimore *forever* and stating that it has a right at its option to remove such night-soil *until the municipality by ordinance see fit to change the method* of disposing of this matter. It is one thing to deny that the local government (the Mayor *and* City Council) in its governmental capacity, can terminate our rights and privileges, and another to deny the power of the Mayor alone, the mere executive, to do so. Our claim is not to a perpetual right, but to a right to remove the night-soil until, in its governmental discretion, the city government sees fit to change the ordinances dealing with this subject. There is, we submit, nothing unlawful, unreasonable or beyond the power of the City Council of 1880 in such a contract as we assert. Whether we have such a contract of course depends upon the proper construction of the Ordinance 121 of 1880, and the contract made under it.

In construing any paper it is always proper to consider the situation of parties to it at the time of its execution. Here was a great city trying to devise some proper and healthful scheme for treating offensive matter, which, if not handled properly would not only create an intolerable nuisance, but might, and probably would, breed pestilence. The legislative branch of the city government itself took charge of the matter, and after advertising for bids (and considering the bids received under the advertisement) determined *by ordinance* to make the contract direct with the contractor whose bid apparently commended itself most to the judgment of the city government.

That when the ordinance provided for a contract for two years, " with the privilege of renewal," it must have meant a renewal from time to time at the option of the contractor, is shown by the following considerations : To perform this work (which, at the time, was a new venture, in the nature of an experiment, and therefore of uncertain profit), it was necessary for the contractor to provide himself with an expensive plant, much of which would necessarily be unfit

for other uses; the bill states that the appellant, at an expenditure of over $80,000, has procured one tug, six scows, 720 acres of land, and the control of forty or more night-soil pits situated in various portions of the twelfth district of Baltimore County.   No contractor in sane senses would risk this outlay if he only had the contract secured to him for the short space of two years, and if, after that short period the contingencies that surround public contracts might take the contract away from him and render his entire plant valueless.  This contract is one which no one would undertake as a business proposition unless some fair assurance of permanence were guaranteed him, and of course the ordinance and contract are to receive a reasonable common-sense construction.

*Second.*—If the privilege of renewal did not belong to the contractor it must have belonged to the Mayor, the Comptroller and the Commissioner of Health, for otherwise the provision would be meaningless.   There would be no sense in stating in a contract that it should be renewed, if *both* parties agreed to it.   That would follow without any stipulation.   But it is not reasonable to suppose that the City Council intended this opinion was to be entrusted to the discretion of these three officials when they were allowed absolutely no discretion in making the original contract.

The ordinance and contract has, as already stated, received the construction we contend for from every Mayor and Comptroller and Health Commissioner from the date of its inception down to the application to Mayor Hooper. If there was any original difficulty about the proper interpretation of the ordinance and contract, this long, uniform and consistent contemporaneous construction put upon the ordinance by all the public officers called on to construe it, would be entitled to, and would receive very great weight, and would solve the difficulty in favor of the contention of the appellant.   *Doll* v. *Ins. Co.,* 35 Md. 107 ; *District of Columbia* v. *Gallagher,* 124 U. S. 510; *Insurance Co.* v.

*Dutcher*, 95 U. S. 273; *Nicherson* v. *R. R.*, 17 Fed. Rep. 408, 410; *Willerts* v. *Ins. Co.*, 81 Indiana, 300.

*Thos. Ireland Elliott, City Solicitor*, (with whom was *Thos. G. Hayes, City Counsellor*, on the brief), for the appellee.

It is to be specially noticed that the ordinance in question not only provides for the removal of night-soil, but also for the payment by all collectors of night-soil in the city of Baltimore to R. R. Zell & Co. of the sum of twenty-five cents per load for each load so collected or removed. The ordinance was therefore not a general but a special ordinance. (1.) It granted to R. R. Zell & Co. without consideration, the license or privilege of removing night-soil gathered in the city of Baltimore, and it excluded from said privilege every other individual, firm or corporation in the city of Baltimore. (2.) It compels all the night-soil collectors to convey the night-soil, when collected, to the wharf or wharves of R. R. Zell & Co., and not to anywhere else; and (3.) It required the payment of a compensation of twenty-five cents per load to R. R. Zell & Co. and to no one else. Surely nothing more can be needed to show that it was intended to be and was an ordinance for the special benefit of a designated firm and had none of the essential features of a general ordinance.

It has been stated in the bill that R. R. Zell & Co. for valuable consideration assigned all their rights and claim to the Bear Creek Fertilizer Co., and it is further shown that the Mayor and City Council of Baltimore compensated the Bear Creek Fertilizer Co. for the removal of certain night-soil which R. R. Zell & Co. had removed previous to their assignment and for which they had failed to secure compensation in the manner provided for by said ordinance. The appellant seeks to draw from these facts the conclusion of a recognition by the Mayor and City Council of Baltimore of the Bear Creek Fertilizer Co. as the assignee of all rights under the ordinance. We suggest that instead of the action of the Mayor and City Council above referred to

being capable of such construction, it is actually an establishment of the fact that R. R. Zell & Co. had defaulted under their contract, and therefore had no contract rights to assign.

It is respectfully submitted that the original ordinance did not contemplate a contract for longer than four years, two of which were provided for in the contract, and two of which were covered by the renewal. The privilege of renewal meant one renewal, and the privilege was exhausted when one renewal had been made. To reason otherwise is to say that the Mayor and City Council has permanently parted with all jurisdiction over the subject-matter, and had authorized the Board of Health to make a contract, a continuation of which could not be interrupted even by the power and authority which had originally brought it into existence. The authorities agree that " a covenant, to receive the construction of perpetual renewal, must be plain and distinct, and such as to bear no other construction without force and violence done to the words and the context," and this Court has recognized the doctrine. *Banks* v. *Haskie*, 45 Md. 219 ; *Cunningham* v. *Patee et al.*, 99 Mass. 252.

When to these objections there is added the additional one of an entire want of mutuality in the contract, appearing from the fact that the Mayor and City Council of Baltimore, or the Board of Health, could never compel a renewal, it seems impossible to believe that the Mayor and City Council of Baltimore should be compelled to be continually renewing such a contract. But this is not all. The Court is now dealing with the rights of the public, against which nothing is to be presumed. *Stein* v. *Bienville Water Supply Co.*, 140 U. S. 80. It is also suggested that if the ordinance is to be construed from its language as creating a perpetuity, it is void, as being beyond the power of the Mayor and City Council to pass.

BRYAN, J., delivered the opinion of the Court.

The appellant filed a bill in equity against the appellee.

The cause was heard on bill and answer, and the bill was dismissed by the Court *pro forma.* An appeal has been taken to this Court.

The Bear Creek Fertilizer Company had made a contract with the Mayor and City Council of Baltimore for the removal of night-soil from the city which, according to its contention, it had the right to renew. The object of the bill was to procure its renewal. The facts which are material to the decision of the question are all admitted. They will be stated. The Joint Standing Committee of the City Council on Health, in March, 1890, having considered a communication from the Commissioner of Health, and also a petition asking that an ordinance should be passed providing a place of deposit for night-soil, recommended the passage of a resolution which they attached to their report. This resolution authorized and directed the Commissioner of Health to advertise for proposals for the removal of all night-soil collected in the city, with a view to awarding the contract to the lowest responsible bidder. Afterwards, on May the eleventh, the same committee after a careful review of the whole subject reported an ordinance embodying a contract, which they believed would prove most advantageous to the city, and would be a great benefit in a sanitary point of view. The ordinance, with some unimportant verbal changes was passed, and on May 24th was approved by the Mayor. The first section of the ordinance is as follows: "Section 1.—Be it enacted and ordained by the Mayor and City Council of Baltimore, That the Mayor, Comptroller of the City and Commissioner of Health be, and they are hereby authorized and directed in the name of the Mayor and City Council of Baltimore, to contract for a term of two years, with the privilege of renewal, with Messrs. R. R. Zell & Co., for the removal of all the night-soil gathered in the city of Baltimore ; said night-soil to be transferred to air-tight barges, for removal from the city ; the same to be done in an odorless and inoffensive manner, at two designated points within the city ; compensation for said

removal of night-soil to be collected from the persons dumping the same, at the rate of twenty-five cents per load of not less than one hundred and sixty and not more than two hundred gallons; and the said Messrs. R. R. Zell & Co. shall be compelled to keep at each of the above designated points, air-tight barges, under a penalty of fifty dollars per day for each day of fourteen hours the said R. R. Zell & Co. fail to comply, and shall execute a bond, with approved security, in the penalty of ten thousand dollars, to the Mayor and City Council of Baltimore, for the faithful performance of said contract." By the third section of the ordinance the Mayor, Comptroller and Commissioner of Health were authorized and empowered to rent to Zell and Company three acres of the city's property in Anne Arundel County for the purpose of erecting works to receive and utilize the night-soil. The fourth section provided that if this use of the said three acres should be deemed a nuisance and should be so declared by the Commissioner of Health, that Zell and Company should remove their works upon thirty days notice from the Mayor, under a penalty of fifty dollars per day for every day the same should remain after the expiration of the notice. And finally by the fifth section, it was enacted that if the contractors should fail to comply with the specifications of the contract to the satisfaction of the Health Department, it should be the duty of the Mayor to revoke the same.

Every step in this proceeding shows that the City Council considered the subject with the deliberation and care which its gravity and importance required. It was a matter which vitally concerned the health of a large and populous city. Neglect in this respect might and properly would cause contagious disease of the most malignant character. To use the words of the Committee on Health, they desired to make a contract which should be most advantageous to the city, and of great benefit in a sanitary point of view. The contract was made by the corporation itself, and not entrusted to the judgment and discretion of any public officer. Cer-

tain public officers were designated, whose duty it was to formulate the document containing the terms of the contract; but its terms and conditions and the individuals with whom the contract was made were all specified in the ordinance. The ordinance having provided for a contract which was considered advantageous and beneficial, it was determined that it should remain under the control of the corporate body, and suitable means were adapted to protect its interest. The contractors were required to give bond with approved security; if the works which they should erect on the land rented from the city should become a nuisance they were required under a heavy penalty to remove them on short notice; and in case they should not perform their contract satisfactorily it was to be revoked. Superadded to all these precautions stipulated in the ordinance, there was the inalienable power of the corporation to abrogate the whole system of night-soil removal, when in its judgment the public health would be protected in a better manner in some other way. In the *Lake Roland case*, 77 Maryland, 381, the police power which embraces the protection of the public health was said to be a high conservative power of the utmost importance to the existence of good government. And it was declared that its exercise could not be limited by contract or any other way; and reference was made to well-known and very remarkable cases in the Supreme Court of the United States. It is unnecessary for us at this time to mention the circumstances stated in the *Lake Roland case*, which would make a municipal corporation liable in damages. The corporation having thus guarded the public interests, and its own rights under the contract, had no reason to desire a change of contractors, so long as the work should be done in a satisfactory manner. Those with whom they were dealing were required to provide an outfit which would involve large expense; and they were authorized to rent from the city real estate for the erection of valuable works. The preparations and expenditures were such as would not have been made for a

contract of transient duration. There was certainly on both sides an expectation of a continuance of the relations between the contracting parties, unless future events should make a change desirable.

The contract for the removal of night-soil was duly made with Zell & Co. ; and they commenced the performance of it. But they failed in business, and the contract was sold by public auction to Wetzler & Co., and by them sold and assigned to the appellant. From time to time the said contract has been renewed with the appellant by successive Mayors, Comptrollers and Commissioners of Health, who in every instance described themselves as representing the corporation and sealed with the corporate seal of the city of Baltimore the written instrument by which the contract was made. The contracts from 1883 to 1895, both years inclusive, are in the same form as the one which appears in the record, and these contracts have been faithfully performed by the appellant. The ordinance under which these contracts were made is still in force. It has been embodied in the codifications of the ordinances made under the authority and with the approval of the Mayor and City Council of Baltimore.

In the year 1885 the appellant presented a petition to the Mayor and City Council of Baltimore, in which it set forth that Zell & Co. had removed a quantity of night-soil amounting to more than thirteen thousand loads, for which they were entitled to receive from the nightmen twenty-five cents a load according to the terms of the ordinance ; that the nightmen before this work was done informed Zell & Co. that they would not pay for it, and thereupon Zell & Co. had a consultation with the Mayor, Comptroller and Health Commissioner, and they urged upon Zell & Co. the necessity of the prompt removal of the night-soil for the preservation of the health of the city, and ordered them to continue the removal without interruption, and said they would see that payment should be made to Zell & Co. for doing so. The petition further stated that the rights and

claims of Zell & Co. under the contract and their claim for the amount due for the removal of these thirteen thousand loads of night-soil had for valuable consideration been assigned to the appellant. The prayer of the petition was that the appellant be paid twenty-five cents a load for the removal of the night-soil, that being the sum stipulated in the ordinance and amounting to more than three thousand dollars. A resolution was passed by the City Council and approved by the Mayor directing the payment, and it was duly paid to the appellant. So we see that after the assignment to the appellant of Zell & Co.'s rights the contract of 1883 was made with the appellant, and in 1885, this contract being brought before the City Council by the appellants' petition, it was recognized and approved by the corporate body under all the forms of legislation; a resolution being passed by both branches of the City Council and approved by the Mayor, which ordered that more than three thousand dollars should be paid to the appellant under the contract. This contract contained a statement of the assignment from Zell & Co. to the appellant, and an assent to the assignment by the Mayor, the Comptroller and the Commissioner of Health, representing the corporation, and the further statement that the appellant had in every respect carried out and fulfilled the contract. And it also stated that the appellant had requested the execution of the contract, with privilege of renewal, and that the Mayor, Comptroller and Commissioner of Health in the name of the Mayor and City Council of Baltimore had assented to said renewal. It was under the corporate seal of the city of Baltimore. The contracts from 1883 to 1895 with the appellant contained the same statement, and are all under the corporate seal.

It appears then that the corporation made a contract with the appellant which was regarded as most advantageous to it, and a great sanitary benefit; that it was made with great care and circumspection, and after much deliberation; that the appellant has in every respect fulfilled its part of the

contract; that the corporation has regularly and uniformly renewed it from time to time; that in its last renewal in 1895 (as in all the previous renewals) it was agreed that the appellant should have the privilege of renewal. From all these circumstances we must see that the corporation has manifested its assent to a continuance of it from time to time, until it should see fit to change its purpose by some corporate act. This corporate act must be done in its legislative capacity. In our opinion the appellant is entitled to a renewal of the contract in the accustomed form; and it must be executed by the Mayor, the Comptroller and the Commissioner of the Health, in the name of the Mayor and City Council of Baltimore.

The *pro forma* decree must be reversed, and the cause remanded, in order that a decree may be passed in accordance with this opinion.

> *Decree reversed and cause remanded, with costs above and below.*

(Decided January 5th, 1898).