BALTIMORE TRUST & GUARANTEE CO. *v.* MAYOR, ETC., OF CITY OF BALTIMORE.

(Circuit Court, D. Maryland. November 13, 1894.)

1. MUNICIPAL CORPORATION—CONTRACTS.

Municipal corporations, invested with full power to control and regulate the use of their streets, do not exceed their powers in making, by ordinance, irrepealable contracts, not exclusive in character, for the use of such streets for purposes of public comfort and convenience.

2. CONSTITUTIONAL LAW — IMPAIRMENT OF CONTRACTS — MUNICIPAL CORPORATION.

A legislative grant, made either directly by the legislature, or indirectly, through a municipal corporation duly authorized so to act, and accepted by the grantee, constitutes a contract, the terms of which cannot be altered, without the mutual consent of the parties, except as the right to repeal or alter is reserved in the enactment itself, or existed in constitutional or legislative provisions; and an impairment of such a contract by a law of the state passed by the legislature, or by a municipality authorized by it, or acting under a statute supposed to give the power, is a violation of section 10, art. 1, of the constitution of the United States.

3. SAME.

The city council of B., whose general powers included the power to exercise full control over the streets of the city, and regulate their use by railway tracks, passed an ordinance granting leave to a street-railway company to construct tracks in certain streets, including a double track in L. street, upon certain conditions to be performed by the company, which ordinance was accepted by the company. Subsequently, the

state legislature, in view of a doubt of the authority of the city council to pass such ordinance, ratified the same by an act which also provided that the city council should have the same power in reference to its amendment or repeal as it would have in respect to an ordinance passed under its general powers. The railway company mortgaged its railway and railway tracks, including the line authorized by said ordinance, to the complainant, to secure an issue of bonds, and proceeded to construct the line. While the construction was in progress, the city council of B. repealed so much of the ordinance as authorized a double track on L. street. *Held*, that such ordinance, having been accepted by the company, constituted an inviolable contract between the municipal corporation and the company; and since the general powers of the city council, as above stated, did not include power to repeal an ordinance creating a contract, and as the ratifying act gave no power to repeal beyond the general powers, the repeal was an impairment of such contract, and a violation of section 10, art. 1, of the constitution of the United States. Morris, District Judge, dissenting.

Bill by the Baltimore Trust & Guarantee Company, trustee, against the mayor and city council of Baltimore. On final hearing.

Steele, Semmes & Carey, for plaintiff.

Thomas G. Hayes and Wm. S. Bryan, Jr., for defendant.

Before GOFF, Circuit Judge, and MORRIS, District Judge.

GOFF, Circuit Judge. The bill in this case was filed by the Baltimore Trust & Guarantee Company against the mayor and city council of Baltimore. The plaintiff is a corporation organized under the laws of the state of Maryland, and defendant is the public municipal corporation of Baltimore city in that state. On the first day of September, 1892, the Lake Roland Elevated Railway Company executed a certain indenture, in which the plaintiff is trustee, for the purpose of securing the payment of the principal and interest of 1,000 first mortgage coupon bonds, of the denomination of $1,000 each, payable in the gold coin of the United States of America, the principal being due on the 1st day of September, 1942. By this deed the Lake Roland Elevated Railway Company granted and conveyed to the Baltimore Trust & Guarantee Company, and to its successor in the trust thereby created, all the railway and railway tracks owned, used, occupied, and enjoyed by said company, including the line of railway authorized to be constructed by the North Avenue Railway Company of Baltimore City, by virtue of Ordinance No. 23, approved April 8, 1891; of the ordinances of the mayor and city council of Baltimore, which authorized the construction of double tracks on Lexington street, in Baltimore, from the corner of Charles and Lexington streets (the city terminus of the railway system of the Lake Roland Elevated Railway Company), eastwardly, along Lexington street, to where it corners with North street. On the 3d day of August, 1892, the board of directors of the Lake Roland Elevated Railway Company contracted for the construction of that road, agreeing to pay therefor the said 1,000 bonds, aggregating $1,000,000, and $100,000 in cash, which action of the board of directors was subsequently, at a meeting of the stockholders of that company held August 6, 1892, duly ratified. In accordance with this contract and the order of the railway company, the mortgage was duly executed, dated September 1, 1892; the bonds also bearing that date. After

the execution and recordation of the mortgage, all of said bonds were duly executed, certified by the Baltimore Trust & Guarantee Company, as trustee, left with the trustee (for purposes connected with said indenture and the building of the road), and afterwards, on the order of the board of directors thereof, delivered to the contractors then engaged in constructing the line. After the work had commenced, when a considerable portion of the road had been finished, and after large expenditures had been made for labor and material for the uncompleted part on which work was then being prosecuted, and after the bonds had been, as before mentioned, delivered, the defendant, on November 18, 1892, by Ordinance No. 1, of that date, repealed so much of the ordinance of April 8, 1891, No. 23, as authorized the placing of double tracks upon Lexington street between North and Charles streets. The plaintiff claims that the effect of this repealing ordinance has been to take away part of the security of the bonds so placed in its custody as trustee, causing the value of the same to materially decrease, and therefore the plaintiff, "in the interest, for the protection, and at the request of all the bondholders, for the purpose of protecting them from an irreparable injury, files this bill."

The Lake Roland Elevated Railway Company was formed and duly organized under the laws of the state of Maryland, by an agreement of consolidation between the North Avenue Railway Company of Baltimore City and the Baltimore, Hampden & Lake Roland Railway Company, which said two companies were corporations created under the laws of that state, the former under the general corporation laws, and the latter by an act of the general assembly. By an act of 1890 (chapter 217) of the general assembly of Maryland, the charter of the North Avenue Railway Company of Baltimore City was amended, by authorizing it to lease, purchase, or aid other roads. In the general railway act, under which that company was incorporated, it was provided "that no railroad company shall be allowed to pass through the city of Baltimore without the consent of the municipal authorities"; and therefore the said North Avenue Company made application to the mayor and city council of Baltimore for consent to the use of certain streets of that city, including the right to lay and maintain double railway tracks on Lexington street, from North street to Charles street, so that it might thereby reach its proposed terminus at the corner of Charles and Lexington streets.

An ordinance was offered in the council on the 17th day of November, 1890, properly referred, considered, and reported, and on April 8, 1891, passed and approved, now known as "Ordinance No. 23." By it the North Avenue Railway Company was authorized "to lay down and construct double iron railway tracks for the purpose of its business" on a number of the streets of Baltimore, including that portion of Lexington before mentioned. This right, so granted, was upon certain conditions, expressly set forth in the ordinance, to the performance of which the North Avenue Railway Company bound itself by accepting the ordinance, and which was assumed by the Lake Roland Elevated Railway Company, by virtue of the agreement of consolidation under which it succeeded to all of the corporate

rights of the North Avenue Railway Company. The following are among the terms and conditions set forth in said ordinance: That the North Avenue Company shall permit other railway companies to use its tracks upon certain conditions; that it shall carry over its lines, free of charge, passengers who present transfer tickets from any other city passenger railway company connecting with it; that it shall at all times keep the space between its tracks, and two feet on each side thereof, in good repair, and whenever any portion of any street upon which its tracks shall be laid shall be repaved, the company shall pay the entire expense of repaving such space with such pavement as the mayor and city council shall prescribe; that the company shall permit all electric light, telephone, telegraph, or other wires on North street to be strung on its elevated structure; that the company shall be liable for the payment of the park tax, and be subject to all the general regulations then existing or thereafter to be made relative to city passenger railways not inconsistent with said ordinance; that the mayor and city council of Baltimore shall have the privilege, within two years after the expiration of fifteen years from the passage of said ordinance, to purchase the stock and interest of said company, with such appurtenances to the same as the mayor and city council might deem proper.

Before the Lake Roland Company began the erection of its elevated railway on North street, it was necessary for it to obtain from the general assembly of Maryland a ratification of Ordinance No. 23, which was done by chapter 112, Acts 1892, in the following words:

"Be it enacted by the general assembly of Maryland: Section 1. That Ordinance No. 23, of the mayor and city council of Baltimore, approved April 8, 1891, be, and the same is hereby, ratified and confirmed; this ratification to have the same effect as if the mayor and city council of Baltimore, at the time of the passage of said ordinance, had been fully authorized by the general assembly to pass said ordinance, and to grant each and all of the powers and privileges therein contained; the said mayor and city council to have the same power and control hereafter, in reference to the enforcement, amendment or repeal of said ordinance, as it has or would have, in respect to any ordinance passed under its general powers."

This act certainly removes all doubt as to the power of the city authorities to pass Ordinance No. 23; and, if the right did not exist before, this action of the legislature cures the defect, and makes the grant of the mayor and city council valid, subject to their right to enforce, amend, or repeal, possessed by them under their general powers.

The plaintiff insists that Ordinance No. 23, by which the North Avenue Company was authorized to lay and maintain double tracks on Lexington street (it having been accepted, and large expenditures of money made thereunder), constitutes an inviolable contract between the municipal corporation and the company, the terms of which cannot be altered or impaired without the consent of both parties thereto; and that, consequently, the repealing ordinance of November 18, 1892, is in contravention of the tenth section of the first article of the constitution of the United States (that part thereof which forbids a state from passing a law impairing the obligation of contracts), and is therefore void. The defendant claims that no

federal question is involved in this controversy, and that this court is without jurisdiction of the case.    I am clearly of the opinion, for reasons that will be stated fully as I proceed with its consideration, that this court has jurisdiction of this case, and consequently the demurrer of defendant to the bill will be overruled.

I now come to the consideration of Ordinance No. 23.    Did its enactment and acceptance constitute a contract of the character claimed by the plaintiff, and, if so, has such contract been impaired by the repealing ordinance of November 18, 1892?    These questions are to be answered as the law is found to be applicable to the facts I have stated.    The defendant insists that Ordinance No. 23 was a mere license to the railroad company to use the streets designated in it for railroad purposes, subject to modification or repeal at the will of the municipal authorities of the city of Baltimore; also, that the court of appeals of the state of Maryland, prior to the passage of said ordinance, had decided that the mayor and city council of the city of Baltimore could not pass an irrepealable ordinance, which decision, it is claimed, under the rules of construction relating to such matters, became part of the city's agreement with the railroad company.    In support of this contention, the cases of Rittenhouse v. Mayor, etc., 25 Md. 337, and State v. Graves, 19 Md. 351, are cited.    I have examined them carefully, considering the facts in each in connection with the opinions of the court relating thereto; and I am convinced that it was not the intention of the court of appeals to hold as the defendant here claims, but that it really designed to and did announce the now well-established doctrine that municipal corporations, so far as their own internal affairs are concerned,—such as opening, closing, and grading streets, or constructing buildings for public use in a particular manner, or at a certain place,—can pass no irrepealable ordinance.    The court in those cases did not regard the ordinances as contracts, but considered them municipal enactments or regulations, repealable at the pleasure of the city, as the public interest might demand.

It may be admitted that, as the general railway act of the state of Maryland was passed after the adoption by the people of that state of the constitution of 1867, the right is reserved to the general assembly to repeal, alter, or amend the charters of the North Avenue Railway Company, and of the Lake Roland Elevated Railway Company; and also it may be conceded that if the general assembly of Maryland had repealed the ordinance relative to double tracks upon Lexington street, or authorized the mayor and city council of Baltimore to do so, then there would be no impairment of the obligation of the contract relied on in this case, and that the plaintiff would not be entitled to the relief sought.    It is certainly true that the general assembly has not directly legislated relative to the modification or the repeal of said Ordinance No. 23.    The question next to be answered is, has the mayor and city council, under the authority of the general assembly, done so?    That the municipal authorities of the city of Baltimore, in passing the repealing ordinance, acted under supposed legislative authority, and not in the exercise of a right under their general powers to repeal a mere

license or rule of regulation, is, I think, clear. That they have not the right, under their general powers, to repeal an ordinance passed by them, by which a contract has been created, is also clear; and as their only legislative grant of powers to repeal limits such action, so far as Ordinance No. 23 is concerned, to their general powers, it is quite evident that the authority under which they acted in passing Ordinance No. 1 was supposed, and not real. I cannot agree with counsel for defendant that authority can be found in chapter 370, Acts 1890, and in chapter 112, Acts 1892, General Assembly of the State of Maryland, giving the mayor and city council of Baltimore the power to amend or repeal Ordinance No. 23; but after hearing their arguments, and reading the opinion of the city solicitor relative to their power under said legislation (a copy of which is found in the record of this cause), I can readily understand why the municipal authorities of that city supposed that they had power from the general assembly to pursue the course they did. It is true that by the Acts of 1890 (chapter 370) it is provided that the mayor and city council of Baltimore shall have power to regulate the use of the streets, lanes, and alleys in that city, by railway or other tracks, gas or other pipes, telegraph, telephone, electric light, or other wires and poles, in, under, over, or upon the same; but except in regard to underground conduits for wires, for which purpose it seems to have been enacted, I do not find that it gives any additional authority to said officials, so far as the use of the streets of Baltimore and the regulation of the same are concerned. It has been conceded for years—long recognized as the law—that the mayor and city council of Baltimore have full control over the streets and highways of that city, and the act of 1890 has been held to be "an amplification of their general power over, and right and duty to regulate and maintain the streets and highways of the city for the use of the public." The general railway act of 1876 gave the municipal corporation of Baltimore the general power to consent or to refuse assent to the use of its streets by railroad tracks, and, independent of this, it has been held for years that such municipalities have that general power without the direct authority of the legislature, so far as local or street railways are concerned. Dill. Mun. Corp. (4th Ed.) § 724; Hinchman v. Railroad Co., 17 N. J. Eq. 75; Jersey City & B. R. Co. v. Jersey City & H. R. Co., 20 N. J. Eq. 69; Atchison St. Ry. Co. v. Missouri Pac. Ry. Co., 31 Kan. 661, 3 Pac. 284; Brown v. Duplessis, 14 La. Ann. 842; State v. Corrigan Consol. St. Ry. Co., 85 Mo. 263.

The rule of construction, with respect to legislative grants to corporations, relied on by the defendant, may be conceded,—"that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public." Minturn v. Larue, 23 How. 435; Barnett v. Denison, 145 U. S. 135, 12 Sup. Ct. 819; Hamilton Gaslight & Coke Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90; Fertilizing Co. v. Hyde Park, 97 U. S. 659.

Did chapter 112, Acts 1892, to which I have already alluded, and to which, in connection with the rules and authorities just cited, I will again refer, justify the repeal of Ordinance No. 23? So far as it relates to the right to repeal, does it give to the defendant any power additional to that possessed by the city authorities before its passage? It seems to me that it does not, so plainly so that it is rather strange it should be seriously contended to the contrary. What right to amend, alter, or repeal did the city possess, under its "general powers," prior to the date of said enactment? In this case it has just such right, and no more, as it reserved in Ordinance No. 23. The general assembly, by said chapter 112, did not intend to reserve to the city authorities any additional or absolute right of amendment or repeal, but is careful to limit them to the "same power and control" as they would have under their "general powers." If an ordinance passed by them does not constitute a contract, but simply relates to affairs as to which the city alone is interested, then, under their general powers, their right to amend or repeal it is without limit. If a contract has been created by the ordinance, then the right to amend or repeal is such as was reserved to the city in the enactment itself. The only clause in Ordinance No. 23 providing for changes in or amendments to it is in the following words: "And shall be subject to all the general regulations now existing or hereafter to be made, relating to city passenger railways not inconsistent with this ordinance." I do not find the right to repeal in this reservation, but simply the right to regulate, provided that the regulations proposed are not inconsistent with the terms of the ordinance. The right to regulate will not be held to mean the right to repeal or materially modify, or, in effect, to prohibit, the exercise of privileges previously granted by the state and city, or to impair the obligation of a contract or destroy vested rights. I think that municipal corporations, invested with full power to control and regulate the use of their streets, do not exceed their powers in making irrepealable contracts, not exclusive in character, for the use of said streets for purposes relating to the public comfort and convenience; and, also, that a legislative grant made either directly by the legislature, or indirectly through a municipal corporation duly authorized so to act, constitutes a contract between the parties thereto, the terms of which cannot be altered without their mutual consent, except so far as the right to alter, amend, or repeal is expressly reserved in the grant itself, or existed in constitutional or legislative provisions at the time of its passage. Were this not so, there would be but little security for investments made on the faith of such grants, and no inducement to those controlling capital to make improvements absolutely necessary for the health and happiness of the people, and for the progress and prosperity of the country. Justice requires that such legislative enactments, when the grantees thereof have accepted the same and acted thereunder, should become absolute and irrevocable contracts, which neither party thereto will be permitted to revoke, nor allowed to disregard or add conditions thereunto more onerous than those first imposed.

I find from the decisions involving the questions I have been con-

sidering that where rights and privileges have been lawfully granted to and accepted by either a private or public corporation, and valuable improvements have been made on the faith of such grant, a contract has been thereby entered into, the impairment of which by a law of the state making such grant, passed by the legislature thereof, or by a municipality authorized by it, or acting under the authority of a statute supposed to give the power (the right so to do not having been reserved), is forbidden by section 10 of article 1, of the constitution of the United States. Trustees v. Woodward, 4 Wheat. 518; Chicago v. Sheldon, 9 Wall. 50; Shields v. Ohio, 95 U. S. 319; New Jersey v. Yard, Id. 104; Railroad Co. v. Richmond, 96 U. S. 521; Wright v. Nagle, 101 U. S. 791; Greenwood v. Freight Co., 105 U. S. 13; Railroad Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. 1009; New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 650, 6 Sup. Ct. 252; Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273; Sioux City St. Ry. Co. v. Sioux City, 138 U. S. 98, 11 Sup. Ct. 226; St. Louis v. W. U. Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485; Saginaw Gaslight Co. v. City of Saginaw, 28 Fed. 529; Coast Line R. Co. v. Mayor, etc., City of Savannah, 30 Fed. 646; Citizens' St. R. Co. v. City of Memphis, 53 Fed. 715; State v. Corrigan Consol. St. Ry. Co., 85 Mo. 263; City of Burlington v. Burlington St. Ry. Co., 49 Iowa, 144.

I do not think it necessary, having reached the conclusions indicated, to consider other questions referred to in the pleadings and argument of this case, among them those of res adjudicata, of acquiescence, and of the police power of municipalities. I will simply add that, as the plaintiff in this case was not a party to the case in the state courts between the Lake Roland Elevated Railway Company and the mayor and city council of Baltimore, it is not bound by the judgment rendered therein; that even if the railroad company did acquiesce in the repeal of Ordinance No. 23, which is not at all apparent, this plaintiff would not be concluded thereby; and that, as I hold Ordinance No. 23 to be a contract of the character described, it will be profitless to now consider the police powers of the municipal authorities of the city of Baltimore. In declaring this result, I am constrained to dissent entirely from the opinions delivered by the court of appeals of Maryland in the case of Lake Roland El. Ry. Co. v. City of Baltimore, 77 Md. 352, 26 Atl. 510, construing the legislation of the general assembly of that state and the ordinances of the mayor and city council of Baltimore relating to this controversy. The judgment of that deservedly distinguished tribunal, announced after careful consideration, and reaffirmed after additional deliberation, caused me, as I examined this case, to doubt the correctness of the conclusion I found myself reaching, and forced me again to reflect on the facts and study the authorities pertinent thereto. A careful re-examination of this case led me to conclude that my brothers had compelled me, in the discharge of my judicial duty, to differ with them. In construing the statutes of a state, we follow, as a rule, the interpretation placed thereon by its court of last resort; but, when connected therewith is involved also the construction of the federal constitution and the security of the interests

protected by it, we feel impelled to rely upon the decisions of the supreme court of the United States. We may add that should we, under such circumstances, be without the guidance of that court, we would in that emergency beg to be permitted to think and act for ourselves, indulging the hope that our conclusion would accord with the decision of the state tribunal; and we would be unworthy of the respect of those with whom we differ, and deserving of the contempt of all who agree with us, should we, under such circumstances, decline to enter such decree as, in our judgment, the true interpretation of the federal constitution requires us to announce.

A decree will be passed as indicated in this opinion, in substance as prayed for in plaintiff's bill.

MORRIS, District Judge (dissenting). I am unable to concur in the opinion of the circuit judge. The powers of the city of Baltimore to pass ordinances with respect to its public highways are only such as the legislature has given to it. It has been given power to pass ordinances promoting the interests and insuring the good government of the city; to open, grade, and pave its public highways; and by the act of 1890 (chapter 370) it was given the power "to regulate the use of the streets, lanes and alleys in said city by railway or other track, gas or other pipes, telegraph, telephone, electric light or other wires or poles"; and, also, it has such further powers as have been given to the city in respect to railroads on its streets by the general railroad law, so far as that law is applicable to city passenger railways. That law (Code, art. 23, § 169), originally passed in 1876 (chapter 242), provides that, in locating any railroad to occupy any street, it shall be competent for the municipal authorities to agree with the railroad company upon the manner, terms, and condition upon which the street may be used or occupied, and further provides that no railroad company shall be allowed to pass through the city of Baltimore without the consent of the municipal authorities. Possessing the powers just enumerated, the city passed the Ordinance No. 23, known as the "North Avenue Ordinance," approved April 8, 1891. It contains the authority under which the Lake Roland Elevated Railway Company, as the successor of the North Avenue Railway Company, has constructed its electric road in Baltimore city. It is an elaborate ordinance, containing many provisions and conditions. It authorized a double iron railway upon the streets mentioned in it, including Lexington street between North and Charles streets. It directs that the tracks shall be laid under the supervision and direction of the city commissioner, and has other provisions regulating the laying of the tracks. It provided, among other things, that, if any final judgment for damages done to property by the construction of the elevated portion of the road was not paid in 60 days, the owner should have the right to enjoin the operation of the railway; also, that, within two years after any successive period of fifteen years from the passage of the ordinance, the city should have the right to buy out the railroad company at a fair valuation. These and other

provisions seem to indicate that the city, in passing this ordinance, could not have been legislating in the exercise of a power derived from its general powers to regulate the use of its streets, but must have been "agreeing" with the railroad company, as empowered by the general railroad law, as to the terms, manner, and conditions upon which the railroad company might use the streets designated, and as to the terms upon which it would consent to such use.

This ordinance was before the court of appeals of Maryland in Koch v. Railway Co., 75 Md. 222, 23 Atl. 463, and was treated by that court as one which the city could validly pass except as to the elevated structure to be constructed on about three-quarters of a mile of its line. As to this, the court of appeals held (January 28, 1892) that it came within the prohibition of the general railway law of the state (Code, art. 23, § 186), which provided that no elevated railroad should be constructed except under a special charter of the general assembly. Thereupon, for the purpose of curing this difficulty, the legislature was applied to and passed the act approved March 17, 1892 (chapter 112). This act recites that, by City Ordinance No. 23, the North Avenue Railway Company was duly authorized and empowered to construct, maintain, and operate an electric railway, with the rights and privileges and subject to the terms and conditions in said ordinance set forth, with the right to elevate its tracks on North street; "but before the railway company can elevate its tracks on North street it is required by law that the sanction of the general assembly of Maryland should be given to said ordinance so far as it relates to the elevation of its tracks;" and thereupon it enacts that the ordinance is ratified and confirmed, "this ratification to have the same effect as if the mayor and city council of Baltimore, at the time of the passage of said ordinance, had been fully authorized by the general assembly to pass said ordinance and to grant each and all of the powers therein contained; the said mayor and city council to have the same power and control hereafter in reference to the enforcement, amendment or repeal of said ordinance as it has or would have in respect to any ordinance passed under its general powers." The Lake Roland Company, as successor to the rights of the North Avenue Company, proceeded to construct the road under the terms of this ordinance; but before the railroad was completed, and before it was operated, the city council passed Ordinance No. 1, approved November 18, 1892. It recites that by Ordinance 23 the railroad company had been authorized and licensed to lay double iron railway tracks on Lexington street between North and Charles streets; and "whereas, it appears to the mayor and city council of Baltimore that the public safety and convenience and the proper regulation of the use of the streets requires that there shall not be more than one iron railway track laid down, constructed or maintained on said portion of Lexington street," and after a further recital that notice had been given by the city officials to the railroad company before the tracks were laid that they would be detrimental to the public interest, and that the mayor would, as soon as the city council met, recommend the revoking of the authority to lay such double tracks on Lexington street, it proceeds to enact that the ordinance, so far

as it authorizes the laying of double tracks on Lexington street, be repealed, and authorizes the maintaining and use of one track only. It is this repeal, enacted, as the city claims, by virtue of its powers derived from the state legislature, which the complainant contends is an impairment of an existing contract between the city and the Lake Roland Elevated Company within the prohibition of the federal constitution.

The act of 1892 (chapter 112), as I understand it, goes to the extent of a recognition by the legislature (as had before been held by the court of appeals of Maryland) that Ordinance 23, except as to the elevated structure, was, when it was passed, a valid exercise of general powers which were vested in the city; and the act provided that, so far as any ordinance passed under those general powers was subject to amendment or repeal by the city, this ordinance should remain so. This proviso, if it has any effective force, must, it seems to me, have reference to some supposed power of the city in its governmental capacity for the public welfare to require the railroad to be constructed or operated or restricted in some manner different from the precise manner set out in the ordinance; some change of speed differing from that provided in the ordinance, some change with respect to its overhead electric wires, or some change in the location of the tracks on the streets. If it had no reference to some such alteration or modification of the terms of the ordinance, the insertion and enactment of the proviso would seem to have been idle and nugatory.

It may be conceded that, under the general railroad law, the city had the power to "agree" with the railroad company as to the use of the streets, and, under that power, to make the agreements embodied in Ordinance 23; but, in my judgment, that agreement was necessarily made subject to the rule that, except by express authority from the legislature, the city, being but a trustee of the public highways for the benefit of the public, could pass no irrevocable ordinance depriving itself of its power to regulate the use of the streets so as to prevent danger to the public. As soon as it becomes apparent that a privilege of using the streets has been granted by it which works danger to the public, it becomes the duty of the city to so regulate or modify the privilege as to protect the public, especially if this can be done without destroying the essential substance of the privilege. Parties entering into contractual relations with a municipal corporation, in its municipal character, do so with notice that it cannot contract away its own governmental functions and duties, which are to be exercised from time to time for the benefit of the public, as occasion requires. This doctrine had been repeatedly enforced by the court of appeals of Maryland with regard to the city of Baltimore, and is the law of the state. State v. Graves, 19 Md. 351; Rittenhouse v. Mayor, etc., 25 Md. 337; Goszler v. Georgtown, 6 Wheat. 593; Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110. It is the general law that a grant by the legislature itself of a privilege or franchise does not restrict the power to enforce regulations for the public safety not inconsistent with the essential rights granted by the charter. New Or-

leans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 650, 6 Sup. Ct. 252.

If in any case it is doubtful whether or not there has been an irrevocable grant of the use of a public highway, the rule applies that the construction favorable to the public, and not to the private grantee, should prevail. In considering the rightfulness of the exercise of the governmental power of the city to regulate the use of the streets by railways, it is to be noticed, in this case, that Ordinance No. 1, while it is a restriction, does not take away the right to maintain a railway on Lexington street, and is not destructive of the object of the ordinance which it, in small part, repeals. The portion of Lexington on which the railroad company is restricted to one track consists of three short blocks in the heart of the city. where the street is of a steep grade, and is less than the usual width, and where it passes some of the principal public buildings. There is shown by the proofs to have been diversity of opinion among the property owners on the street as to the danger, inconvenience, and obstruction resulting from double tracks; but enough appears to show that the position taken by the city officials and by the city council has strong support, and that it is a case in which it cannot be said that the action of the city council was wanton and in bad faith. With the strong presumption in favor of the reasonableness of the ordinance, I cannot see how, upon the testimony, it can be declared to be unreasonable and oppressive. Cases may be found in which the courts have held with regard to horse railroads in cities that it was not a justifiable withdrawal of a valid grant to reduce the railroad to one track, but the special circumstances must control. An electric railroad, in its speed, in the weight and momentum of its cars, in the danger to persons on foot and in vehicles (especially when the cars are run on frequented and narrow streets), approximates the danger of steam locomotives, rather than that of horse cars; and the duty of the city with regard to them is more stringent in proportion to the greater danger. If the city had ordained that the public safety required that but one car at a time should be allowed on Lexington street hill, so that there never should be both one ascending and one descending, it would be difficult to maintain that such an ordinance was not a proper exercise of the power to regulate the use of the street. The restriction to one track accomplishes the same result, with the advantage that the track is in the middle of the street. In my judgment, the restriction to the use of one track, under the circumstances, is an exercise of a governmental power, which the city never parted with, and subject to which the "North Avenue Ordinance" was accepted by the railroad company.

I have briefly stated my dissent without citation or discussion of authorities, for the reason that the authorities have been fully cited and discussed in the opinions delivered in the court of appeals of Maryland in the case of the Lake Roland El. Ry. Co. v. City of Baltimore, 77 Md. 352, 26 Atl. 510.