WILLIAMSON et al. v. CITY OF CLAY CENTER. (two cases).*

WILLIAMSON v. CITY OF CLAY CENTER et al.

(Circuit Court of Appeals, Eighth Circuit.  September 4, 1916.)

Nos. 4492–4494.

1. **Judgment** ⌖707—**Persons Concluded—Mortgages—Mortgagee Not Party.**

A mortgagee of an electric light plant is not bound by a decree holding void a provision of the ordinance under which the plant was operated relating to a renewal of the franchise, where it was not made a party to the suit.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. ⌖707.]

2. **Fixtures** ⌖18(5)—**Machinery Attached to Realty—Intent of Parties to Mortgage.**

An electric lighting plant was operated by dynamos placed in the power house of a mill operated by water power, other property of the same owner. The dynamos were fastened to the mill timbers by bolts, and connected with the line shaft of the mill by bolts. During a series of years the owner gave chattel mortgages at various times on the light plant, and also mortgaged the mill, land, and water power as separate property. *Held* that, as against a mortgagee of the mill property who had full knowledge of such facts, the dynamos were not included as fixtures.

[Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 38–41; Dec. Dig. ⌖18(5).]

3. **Mortgages** ⌖133—**Property Included—"Appurtenances."**

The light plant did not pass under a clause of the mortgage covering "appurtenances," no part of it having any connection with the operation of the mill.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 260, 264, 265; Dec. Dig. ⌖133.]

4. **Municipal Corporations** ⌖680, 681(1)—**Control Over Streets—Use by Electric Companies.**

Under Comp. Laws Kan. 1885, § 834, relating to cities of the second class, and giving to the city council, among other powers, general control over the streets, such council had power to permit an electric light company to occupy streets with its poles and wires, and without such permission they could not lawfully be so occupied.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1459; Dec. Dig. ⌖680, 681(1).]

In Error to and Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Quo warranto by the City of Clay Center against the Clay Center Light & Power Company, the Merrimack River Savings Bank, and F. L. Williamson. Decree for complainant, and defendants Williamson and the Savings Bank bring error and also appeal. Affirmed.

Action at law for damages by F. L. Williamson against the City of Clay Center and others. Judgment for plaintiff for less than his claim, from which he brings error. Affirmed.

D. R. Hite, of Topeka, Kan., and F. L. Williams, of Clay Center, Kan. (Mulvane & Gault, of Topeka, Kan., on the brief), for plaintiffs in error and appellants.

---

⌖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied December 12, 1916.

R. C. Miller, of Clay Center, Kan. (F. B. Dawes, of Clay Center, Kan., on the brief), for defendant in error and appellee.

Before SANBORN, Circuit Judge, and REED and BOOTH, District Judges.

BOOTH, District Judge. Nos. 4492 and 4493, entitled F. L. Williamson and Merrimack River Savings Bank v. City of Clay Center, represent respectively a writ of error and an appeal in a case, No. 8940 in the court below, entitled City of Clay Center v. Clay Center Light & Power Company, Merrimack River Savings Bank, and F. L. Williamson. The defendant Clay Center Light & Power Company disclaimed in the court below, and the other defendants have pursued their remedy, both by writ of error and by appeal from the decision of the court below.

No. 4494, entitled F. L. Williamson v. City of Clay Center et al., represents a writ of error in a case, No. 8991 in the court below, in which F. L. Williamson was plaintiff and the City of Clay Center and certain individuals were defendants.

No. 8940 was a proceeding instituted by the City of Clay Center against Clay Center Light & Power Company and the Savings Bank and Williamson, for the purpose of having it adjudged that the right of the defendants to operate a certain electric light plant in the city, had expired, and for an order requiring defendants to remove their poles and other property from the streets of the city. The cause was originally commenced in the Supreme Court of the State of Kansas as a quo warranto proceeding. It was duly removed to the United States District Court for the District of Kansas, First Division, and is sometimes known as the "ouster suit." In this suit the defendant Light & Power Company disclaimed, and the defendant Savings Bank interposed a cross-bill, asking for equitable relief. The court below found in favor of the plaintiff city against both said Savings Bank and Williamson.

No. 8991 below was an action at law to recover damages against the city and certain of its officers for wrongful destruction of certain property belonging to the plaintiff Williamson, consisting of electric lights, poles, wires, etc., and for interfering with and damaging plaintiff's property with intent to injure and destroy plaintiff's business. The court below found in favor of the plaintiff, and assessed the damages at $1,000. Judgment was entered, and the plaintiff, being dissatisfied with the amount, sued out a writ of error.

The above-mentioned controversies involved to some extent the same questions, and were tried together in the court below upon the same evidence. The main questions involved in the law action were: (1) Whether the plaintiff, Williamson, had a right to use and occupy the streets of the city of Clay Center with his electric poles, wires, etc., at the time when they were destroyed by the city authorities. (2) Whether the damages for the destruction were to be measured merely by the value of the actual physical property destroyed, or whether the plaintiff had also rights in a going business concern, which were injured by the acts of the city. The ouster suit involved the further question whether the mortgage held by the defendant Savings Bank

upon certain property covered the electric light plant and franchises, so as to make the Savings Bank an interested party in the controversy between Williamson and the city. The court below held that the mortgage of the Savings Bank did not cover the electric light plant, and consequently dismissed the cross-bill of said bank.

A brief statement of the facts concerning the history of the electric light plant and franchises is necessary.

In 1876, Alonzo F. Dexter was the owner of two strips of land, one on each side of the Republican river, near Clay Center, Kan. About that date he erected a dam across said river at this point. Dexter also owned a tract of land known as Dexter's mill block; and about the same date he erected a water power flouring mill upon this block. He also built a flume and a power house for the operation of his machinery by water power. From 1876 until 1886, Dexter carried on the business of operating the mill. In 1886, the city of Clay Center, a city of the second class under the laws of Kansas, passed the following ordinance, which is sometimes referred to as Ordinance No. 87, and sometimes as Ordinance No. 26:

"Ordinance No. 26.

"An ordinance providing for lighting the city of Clay Center, Kansas, by electricity.

"Be it ordained by the mayor and councilmen of the city of Clay Center:

"Section 1. That Alonzo F. Dexter, of Clay Center, Kansas, his successors and assigns, are hereby granted the right of way and authorized to use the streets, avenues, alleys and public grounds of this city for the purpose of erecting and maintaining poles and running wires thereon for the conveyance of electricity to furnish light and power for the use of the said city and its inhabitants. Said poles shall be erected on the outside limits of the sidewalks on all streets and avenues and on the sides of the streets, avenues and alleys designated by the city council.

"Section 2. The poles mentioned in the preceding section shall be as large, or larger than those ordinarily used for telegraph poles, and the wires shall be insulated and placed high enough above the ground so as not to interfere with public travel, on any of the public or private property of said city.

"Section 3. That the said Alonzo F. Dexter, his successors and assigns, shall not charge for light furnished any of the inhabitants of this city a sum greater than the equivalent of best coal gas at two dollars per thousand cubic feet, or a sum not greater than one hundred dollars per annum per arc light of two thousand candle light power, or twenty dollars per annum for incandescent light of sixteen candle power.

"Section 4. The said Alonzo F. Dexter, his successors and assigns, shall establish within the city limits electric light works of sufficient power at all times to furnish all the light needed for the use of said city and the inhabitants thereof, and shall furnish both arc and incandescent lights at prices not to exceed those named in the second section of this ordinance.

"Section 5. The said Alonzo F. Dexter, his successors and assigns, shall not charge the city of Clay Center for light furnished to light its streets or public buildings a sum greater than an equivalent of best coal gas at one dollar and seventy-five cents per thousand cubic feet, either for incandescent or arc lights.

"Section 6. That Alonzo F. Dexter, his successors and assigns, shall furnish arc lights for the use of this city, of two thousand candle light power at a sum not to exceed one hundred dollars per annum per light, and shall furnish incandescent lights of sixteen candle power for the use of said city for a sum not to exceed twenty dollars per light per annum; provided the city shall take and use not less than five such arc lights or thirty such incandescent lights. The said Alonzo F. Dexter, his successors and assigns, to

furnish everything necessary and light and extinguish the lights; said lights to be kept burning all night except nights when the moon gives sufficient light to light the city.

"Section 7. That the city of Clay Center reserves the right to grant equal and like privileges to any other person or company during any or all the time covered by this ordinance.

"Section 8. That the said Alonzo F. Dexter, his successors and assigns shall at all times furnish light for the use of this city, and the inhabitants thereof at as cheap a rate as electric light is furnished any city or inhabitants thereof in the United States.

"Section 9. That the rights and privileges hereby granted are for a term of twenty-one years: Provided, the said Alonzo F. Dexter, his successors and assigns, shall begin the erection of said electric light works within ninety days from the passage of this ordinance, and shall complete the same and have the same in working order within one year from the passage of this ordinance; and provided, further, that if at the expiration of twenty-one years the city shall refuse to grant a further continuance of these privileges, the said city shall purchase said works at their appraised value, the same to be appraised by three disinterested electors of the state of Kansas, one of whom shall be chosen by the city, one by Alonzo F. Dexter, his successors and assigns, and the two so chosen shall select a third, and the amount agreed upon, upon their oaths, by the three so chosen shall be the price to be paid therefor; and provided, further, that the city of Clay Center shall have the right to revoke the privileges herein granted, at any time, if the said Alonzo F. Dexter, his successors and assigns, shall fail to comply with all the provisions of this ordinance.

"Section 10. This ordinance shall take effect and be in force from and after its passage, approval and publication in the Dispatch."

Pursuant to said ordinance and during the year 1886, Dexter occupied certain of the streets and alleys and public grounds of the city of Clay Center with electric light poles, and strung wires upon said poles, for the purpose of conveying electric current and furnishing light to the city and the inhabitants thereof. Dexter placed his dynamos or electric generators in the power house of his mill plant. Said dynamos were firmly fastened to the timbers and framework of the power house by bolts; and said dynamos were attached to the line shaft extending from the water wheel to the shaft of the mill proper by belts extending from said line shaft to the dynamos. From 1886 until 1910, said electric plant was operated, either by Dexter or the succeeding owners, by the water power of the mill, in the manner above stated.

Mortgages were placed upon the above-described property, or some portion thereof, as follows:

(1) August 10, 1886, a chattel mortgage by Dexter to the Western Electric Company amounting to $4,900; property covered:

"Two 25 light dynamos, 50 arc lamps, wires, and poles belonging to Dexter electric light plant in Clay Center."

(2) December 10, 1886, a chattel mortgage by Dexter to the Western Electric Company amounting to $2,450; property covered:

"Three electric generators and appurtenances, and all lamps, globes, wires, and poles used in maintaining electric light in Clay Center."

(3) July 27, 1887, a chattel mortgage by Dexter to Western Electric Company amounting to $1,500; property covered:

"Four electric dynamos used by Dexter in operating electric light plant in said city of Clay Center; all lamps, wires, fixtures, and poles."

(4) June 6, 1889, a chattel mortgage by Dexter to Wickstrum & Swenson, amount $5,000; property covered:

"All dynamos, wires, all arc and incandescent lamps, poles, and attachments, and all machinery connected with the electric light plant of Clay Center."

This last-mentioned mortgage, with the note which it secured, were duly assigned by Wickstrum & Swenson to the defendant Savings Bank.

(5) August 5, 1891, a chattel mortgage by Dexter to the First National Bank of Clay Center, amount $5,000; property covered:

"The Clay Center electric light plant, poles, arc and incandescent lamps, dynamos, wiring, fixtures, machinery, tools and belting belonging to and in use by said party of the first part in producing or to produce electric light in the city of Clay Center, Kansas, subject, however, to a prior mortgage held by Wickstrum & Swenson on said property, dated June 6, 1889; also franchises granted to said party of the first part by the city council of said Clay Center embodied in Ordinance No. 26, approved April 23, 1886."

(6) August 20, 1891, a mortgage by Dexter to Crippen, Lawrence & Co., amount $15,000; property covered:

. The land above mentioned as being owned by Dexter, and being described specifically, and "known as the Dexter water power mill, together with all the buildings connected therewith, all the tenements and appurtenances and machinery thereunto attached and belonging, and all water rights, privileges, water power, and other motive power for operating said mill, including water wheels, machinery, and fixtures appertaining thereto; also all the structure called the Dexter milldam, * * * all water and water privileges by said dam, and all easements and franchises; * * * all the following personal property in and about said mill and its appurtenances, used in the operation of said mill, and constituting in part the tools and machinery belonging thereto [specially described]; * * * also the electric light plant owned and operated by said Alonzo F. Dexter in Clay Center, together with all the electric lights, and dynamos used in the operation of the same, with all line wire, lamps, fixtures, globes, and carbons, and all machinery and tools, including poles and all other apparatus and appliances belonging to and used in connection therewith, and all rights and privileges granted to said Alonzo F. Dexter by the city of Clay Center; also the right to use the water power attached to said Dexter mill in running and operating said electric light plant, * * * hereby granting and assigning to said grantees for the purpose of this conveyance all the rights, privileges, franchises, and advantages granted to said Alonzo F. Dexter by Ordinance No. 87 of the city of Clay Center. * * * All other rights, privileges, and franchises which may be hereafter granted by said city to said Alonzo F. Dexter or his assigns relating to said electric light plant, with the appurtenances, and all the estate, title, and interest of the said party of the first part therein."

This mortgage, together with the note secured thereby, was duly assigned to the Merrimack River Savings Bank.

(7) August 20, 1891, a mortgage by Dexter to Crippen, Lawrence & Co., amount $2,250; property covered: The same as in mortgage No. 6. This last-mentioned mortgage was expressly made subject to mortgage No. 6 above, and was duly assigned, with the note it secured, to Peter Sanborn.

(8) June 21, 1892, a mortgage by Dexter, to Crippen, Lawrence & Co., amount $8,000; property covered: The same as in Nos. 6 and 7. This mortgage was expressly made subject to three prior mortgages,

two to Crippen, Lawrence & Co., Nos. 6 and 7, and one to Wickstrum and Swenson, No. 4 above.

In September, 1892, the First National Bank of Clay Center commenced suit in the district court of Clay county, Kan., to foreclose its mortgage, No. 5 above. In the course of the litigation answers were interposed by Crippen, Lawrence & Co., Peter Sanborn, and the Merrimack River Savings Bank. The court entered its decree adjudging that the Merrimack River Savings Bank had a first lien upon the chattels described in its mortgage No. 4, and a first lien upon the lands described in its mortgage No. 6. It made further findings in regard to the liens of the other parties, and ordered a sale to be made separately of the electric light plant, poles, fixtures, etc., and of the real estate, milldam, and mill. In November, 1894, sale was made by the sheriff; the electric light plant was purchased by P. M. Wickstrum, and the real estate and mill by A. H. Hale. Said electric light plant subsequently became the property of F. L. Williamson & Co., and for several years and until about 1906 was operated by that company. In June, 1906, F. L. Williamson & Co. sold the electric light plant, appurtenances, and fixtures, "up to but not including the line shaft," to the Clay Center Light & Power Company. In November, 1910, said last-named company resold the property to F. L. Williamson.

In January, 1896, A. H. Hale conveyed the real estate and mill properties purchased by him at the sheriff's sale to Joseph J. Crippen, trustee. On January 2, 1899, Crippen, trustee, conveyed the same properties to William Williamson, and on the same day William Williamson and wife, to secure the payment of the purchase money, executed a mortgage thereon to the Crippen-Lawrence Investment Company. The real estate was described in detail, and then follows this language:

"Known as the Dexter water power mill, together with all the buildings connected therewith, and all the tenements and appurtenances thereunto belonging, including the milling fixtures and the machinery thereunto attached and belonging, and all water rights and privileges, water power, and other motive power for the operation of said mill, including water wheels and the machinery and fixtures appertaining thereto. Also the structure called the Dexter milldam erected and maintained across the Republican river, within the boundaries of the tracts of land hereinbefore described for the purpose of furnishing water power for the operation of said mill and the race and water course from the said river through Huntress creek, including all water rights, right of flowage of water on lands of other persons, and all water and water privileges created by said dam, and all easements and franchises in the county of Clay, in the state of Kansas, together with all the appurtenances."

This last-mentioned mortgage, together with the indebtedness secured thereby, was duly assigned to the defendant Savings Bank, present owner of the same.

In 1907, as the contract of the city contained in the ordinance was about to expire, the Clay Center Light & Power Company, being the then owner of the franchise, brought suit in the state court of Kansas to enforce the provision of section 9 of said ordinance. The trial court rendered judgment in favor of the company, but its judgment was reversed by the Supreme Court of the state of Kansas. See Clay Center v. Light Company, 78 Kan. 390, 97 Pac. 377. The Supreme Court

held that the contract contained in the ordinance, in so far as it attempted to impose an obligation upon the city either to renew the franchise or to purchase the electric light plant, was beyond the power of the city to make and consequently void.

Thereafter the Savings Bank brought suit in the United States District Court to restrain the city from cutting down and removing the property of the Light Company from the streets. A restraining order was issued, but upon further hearing an injunction was denied for want of jurisdiction. The restraining order was continued in force pending appeal. An appeal was taken by the bank to the Supreme Court of the United States, but the appeal was dismissed for want of jurisdiction. After the decision, but before the mandate had been sent down, the city, through certain of its officials, cut down and removed certain of the poles and wires belonging to the Light Company. For this act the parties implicated were adjudged by the Supreme Court to be in contempt. Merrimack River Savings Bank v. City of Clay Center, 219 U. S. 527, 31 Sup. Ct. 295, 55 L. Ed. 320, Ann. Cas. 1912A, 513.

After the decision in Clay Center v. Light Company, 78 Kan. 390, 97 Pac. 377, and on November 14, 1910, the Light Company conveyed the electric light plant and its appurtenances to F. L. Williamson, and within a day or two thereafter the city instituted the ouster suit in the Supreme Court of the state, being No. 8940 above mentioned. In April, 1911, Williamson commenced his action at law against the city and certain individual defendants to recover damages by reason of the action taken by the city and its officials in cutting down the poles and wires. This last-mentioned action is No. 8991 above referred to. In the ouster action the Savings Bank filed a cross-complaint, setting up its mortgage of January 2, 1899, made by William Williamson and wife to Crippen-Lawrence Investment Company, claiming that Ordinance No. 87 was valid, and claiming, further, that in order to protect its mortgage it had a right to have the electric light plant operated; further, that it was entitled to a decree against the city to make good the damages done in cutting down the poles, wires, etc.

[1] The Savings Bank was not a party to the litigation in Clay Center v. Light Company, 78 Kan. 390, 97 Pac. 377, and if the mortgage under which the Savings Bank claims is a valid and subsisting lien upon the electric light plant, including the franchise rights, the decision in the case last mentioned, holding Ordinance No. 87 void, would not be binding upon the Savings Bank, but it might again litigate the question of the validity of said ordinance. Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 Sup. Ct. 967, 57 L. Ed. 1410; Keokuk Western R. R. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450; Louisville Trust Co. v. City of Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Baltimore Trust Co. v. Mayor, etc. (C. C.) 64 Fed. 153.

[2] The question therefore arises whether the mortgage under which the bank claims covers the electric light plant. The description of the property contained in the mortgage does not in terms cover the electric lighting plant. It is claimed, however, that the dynamos and other property upon the real estate belonging to the mill company and at-

tached thereto were fixtures, and passed with the mill property, land, and buildings. It is further claimed that the language used in the description in said mortgage, viz. "all easements and franchises in the county of Clay, state of Kansas, together with' all appurtenances," is sufficient to carry the electric light plant. It is unnecessary to discuss at length the various tests for determining when personal property becomes fixtures and passes under a mortgage covering the realty. The all-important question is to determine the intention of the parties. Other tests are simply aids in determining the intention. In the instant case that portion of the electric light property which was placed upon the mill real estate was in no sense accessory to the milling plant. It did not assist in the operation of the milling plant, nor was it placed there for the benefit of the milling plant. The milling plant was entirely independent and complete without the presence of the electric light machinery. Furthermore, the electric light plant and the milling plant had been for years treated as separate properties by the owners thereof, and to the knowledge of the Savings Bank. The Savings Bank had taken an assignment of a chattel mortgage (No. 4 above) on the electric plant only. The Savings Bank had taken another mortgage, covering both the milling property and the electric light property, described specifically and in detail as separate properties (No. 6 above).

In the litigation attending the foreclosure of these two mortgages, the Savings Bank had notice and knowledge of other mortgages, some of which covered the electric lighting plant only, and others which covered both the electric lighting plant and the milling plant, but with a separate and specific description of each. There were two sales upon the foreclosure of the mortgages held by the Savings Bank; one a sale of the real estate and milling property, and the other a sale of the electric light plant. The purchaser of the real estate and the milling property was an officer of the Savings Bank. He thereafter conveyed the property which he purchased to Crippen, who held it as trustee for the Savings Bank, and conveyed it, as such trustee, to William Williamson. William Williamson gave a purchase-money mortgage to the Crippen-Lawrence Investment Company, and this in turn was assigned to the Savings Bank. Meanwhile the electric light plant had passed at the sheriff's sale to P. M. Wickstrum, and thereafter to F. L. Williamson & Co., and was operated by that company for several years. In view of these facts, it is idle to contend that there was any intention, either on the part of Dexter, the original owner, or on the part of any of the persons who thereafter became owners or mortgagees of either the milling property or the electric light plant, that they should be considered in any way except as separate, distinct properties.

[3] As to the use of the word "franchise" in the mortgage of January 2, 1899, under which the Savings Bank claims, it is sufficient to say that it has reference to the milling property and the water power connected therewith. That this is certain is shown by comparing the language with similar language used in the mortgage of August 20, 1891 (No. 6 above), in which last mortgage both the mill property and the electric light plant are described in detail and separately; yet in connection with the description of the mill properties occurs the lan-

guage "and all water and water privileges by said dam, and all easements and franchises." No one would contend that the use of the word "franchises" at this point in mortgage No. 6 above had any reference to the electric light plant. It is equally untenable to hold that it has reference to the electric light plant in the mortgage of January 2, 1899. Nor was the electric light plant covered by the word "appurtenances" in the mortgage of January 2, 1899. As already stated, the electric light plant was not necessary to the milling plant. The two plants were entirely distinct, except that they both used the same water power. Neither plant could, properly be called appurtenant to the other. Humphreys v. McKissock, 140 U. S. 304, 11 Sup. Ct. 779, 35 L. Ed. 473.

In our opinion, the trial court was fully justified in holding that the mortgage of January 2, 1899, under which the Savings Bank now claims, did not cover, and was not intended to cover, the electric lighting plant. It follows that the Savings Bank had not shown itself entitled to any interest in the property in litigation between Williamson and the city, and that the cross-bill of the Savings Bank was properly dismissed.

[4] We will next examine the rights of Williamson to maintain the electric light poles, wires, etc., in the streets of the city at the time of their destruction in 1910. In the case of Clay Center v. Light Co., supra, the Supreme Court of the state of Kansas had decided that the contract contained in the ordinance, in so far as it attempted to impose upon the city the obligation to extend the franchise, or to purchase the lighting plant, was void. The franchise expired by limitation in 1907. The rights of the Light Company, therefore, in so far as they depended upon the ordinance in question, were terminated. Williamson purchased back from the Light Company the plant which he had sold to it, with full knowledge of the litigation between the Light Company and the city, either during the period of the litigation, or just after its termination. He was, therefore, bound by the judgment in the case, and could thereafter predicate no rights under said ordinance.

But it is contended on the part of Williamson that, quite apart from the ordinance, Dexter, the original owner of the electric light plant, had a right to erect and maintain poles and wires in the streets of the city, and that this right became a vested one, which could not be destroyed by subsequent legislation, and that he (Williamson), as successor to Dexter, had acquired this vested right, was the owner thereof, and entitled to maintain his poles and wires in the streets of the city in 1910. This contention on the part of Williamson raises the question of the powers of the city (it being of the second class) over its streets in 1886; whether the city had the power to grant to an individual the right to erect poles and wires in the streets, and the complementary power to refuse such right; or whether an individual could thus occupy the streets without consent of the city.

It is claimed on the part of Williamson that the decisions of the Supreme Court of Kansas have decided that the city had no such power. It is claimed on the part of the city that the decisions are to the

opposite effect. Had this question been passed upon by the Supreme Court of Kansas, we should follow such decision, as being one expounding its own local statutory law. We do not, however, find that the Supreme Court of Kansas has passed upon the exact question raised in the instant case; nor has such question been presented to it in any of the cases which have been called to our attention. Among the provisions of the statute of Kansas relating to the powers of cities of the second class, as existing in 1886, we find the following:

Chapter 19, Compiled Laws 1885:

"Sec. 31. *Power of Mayor and Council.* The mayor and council of each city governed by this act shall have the care, management and control of the city, and its finances, and shall have power to enact, ordain, alter, modify or repeal any and all ordinances not repugnant to the Constitution and laws of this state, and such as it shall deem expedient for the good government of the city, the preservation of the peace and good order, the suppression of vice and immorality, the benefit of trade and commerce, and the health of the inhabitants thereof, and such other ordinances, rules and regulations as may be necessary to carry such power into effect."

Section 55 of the same chapter contains, among other provisions, the following:

"The council shall have power to open, widen, extend or otherwise improve any street, avenue, alley, or lane, and also to vacate or discontinue the same whenever deemed necessary or expedient."

Section 56 reads as follows:

"*Encroachment on Sidewalks, etc.* The council may prohibit and prevent all encroachments into and upon the sidewalks, streets, avenues, alleys and other property of the city, and may provide for the removal of all obstructions from the sidewalks, curbstones, gutters and crosswalks, at the expense of the owners or occupiers of the grounds fronting thereon, or at the expense of the person placing the same there; the council may also regulate the planting and protection of shade trees in streets, the building of bulk heads, cellar and basement ways, stairways, railways, windows and doorways, awnings, hitching posts and rails, lamp posts, awning posts, and all other structures projecting upon or over and adjoining, and all other excavations through and under the sidewalks, or along any streets of the city."

Section 60 reads as follows:

"*Lighting Streets, Numbering Houses, etc.* The council may provide for and regulate the lighting of the streets, and the erection of lamp posts, and the numbering of the buildings in the city, and the construction of sewers; and the council shall have power to make contracts with any person, company or association for such purposes; and give such person, company or association the privilege of furnishing light for the streets, lanes or alleys of said city for any length of time not exceeding twenty-one years. It may also by ordinance adopt a method of numbering the buildings, and make contracts to secure the same to be done."

Under the general power thus granted was included the right to control the putting up and maintaining poles, wires, etc., in the streets of the city. Such right to erect and maintain poles, wires, etc., could be obtained only from the municipality, or from the Legislature itself. See Dillon on Municipal Corporations (5th Ed.) §§ 1296–1302; New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516; Pikes Peak Power Co. v. City of Colorado Springs, 105 Fed. 1, 44 C. C. A. 333; Board of Mayor, etc., of Morristown v. East Tenn. Tel. Co., 115 Fed. 304, 53 C. C. A. 132; State v. Murphy, 134

Mo. 548, 552, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369, 56 Am. St. Rep. 515.

In Atchison Ry. Co. v. Mo. Pac. Ry. Co., 31 Kan. 660, 3 Pac. 284, the court had before it a somewhat similar question. A bill was brought by plaintiff to enjoin defendant from cutting and crossing plaintiff's street railway track. The defendant claimed that the plaintiff had no rights in the street. Plaintiff was occupying the street under an ordinance of the city (of the second class), and the question arose whether the city of Atchison had any power to grant the plaintiff the right to occupy the street. The court in its opinion said:

"Had the Legislature given to the city of Atchison this power? It is conceded that no special grant of power in this direction had ever been made; but the contention is that the general control of the streets vested in the corporation was sufficient to validate its action in granting permission to plaintiff to occupy the streets with its railway. This proposition we think must be sustained."

The court then cites sections 31, 55, and 56 of chapter 19, supra, which were then in force as sections 31, 54, and 55, and says:

"Now under this we think the council had power to permit a street railway company to construct and operate a railway upon the streets."

Further on the court said:

"All we decide is that the city had the power and did give the plaintiff permission to occupy the streets with its railway track; that such railway track was therefore not an obstruction, and could not be disturbed wantonly by a stranger."

It will thus be seen that the court held that, under the same sections of the statutes relating to cities of the second class which were in force at the time when the Dexter ordinance was passed, such city did have power over its streets, and by virtue of such power could permit the occupancy of the streets by a street railway company.

The case of La Harpe v. Gas Co., 69 Kan. 97, 76 Pac. 448, was decided in 1904. The city of La Harpe was a city of the third class. An ordinance had been passed in 1901 granting to one Evans the right to use the streets and alleys of the city for laying and maintaining pipes to convey oil, gas, and water. The Gas Company had acquired the property in 1902, and undertook to lay certain pipes under one of the alleys of the city. Previous to this time the Evans ordinance had been repealed by a later ordinance, and the city claimed that the Gas Company had no rights in the streets. The Gas Company brought suit to enjoin the city from interfering with its operations. The lower court granted an injunction, and this was affirmed by the Supreme Court; the latter court holding that the Gas Company had the right to use the streets of the city without the city's consent.

It is to be noted, however, that at the time when the La Harpe Case was decided the following statutory enactments were in force, and were involved in the case. Article 12, c. 23, Gen. St. 1868, relating to gas and water corporations; section 88, c. 23, Gen. St. 1868, as amended by chapter 64, Sess. Laws 1871, as further amended by chapter 58, Sess. Laws 1876, as further amended by chapter 85, Laws 1891, and as further amended by chapter 128, Laws of Kansas, 1901. It was upon

these statutory provisions relating to gas companies and certain other corporations that the decision in the La Harpe Case was based, and especially in view of the express provision in said statutes that the pipes, etc., of such corporation might be laid "through any street or alley, or public ground of any city of the second or third class." The court held that this was a direct authority from the Legislature to the gas company to occupy the streets, and that no consent was necessary. In its opinion the court said:

"A city is a creation of the Legislature—a subordinate agency of the state, which exercises only such power as the Legislature confers, and for such period of time as the Legislature in its discretion determines. The state gives, and the state can take away; and the Legislature is at liberty to resume so much of the control of the streets and alleys and public grounds formerly exercised by the city as it deems best, and this without obtaining the consent of either the officers or the inhabitants of the city."

In the instant case neither Williamson nor his predecessor, the Light Company, come within the terms of the statutory enactments which were controlling in the La Harpe Case. Doubtless the Legislature might have included electric light companies in said statutes, but it did not do so. The La Harpe Case did not decide that, in the absence of statutory enactment giving direct permission from the Legislature, either an individual or a corporation could occupy the streets of cities of the second class. But it did hold that the statutory permission claimed in the La Harpe Case, direct from the Legislature, was sufficient and controlling.

The case of McCann v. Telephone Co., 69 Kan. 210, 76 Pac. 870, 66 L. R. A. 171, 2 Ann. Cas. 156, involved simply the question whether telephone poles upon a rural highway constituted an additional servitude. It was answered in the negative. This was the only question in the case.

The cases of City of Wichita v. Telephone Co., 70 Kan. 441, 78 Pac. 886, and Telephone Co. v. City of Concordia, 81 Kan. 514, 106 Pac. 35, involved questions similar to those in the La Harpe Case, and were decided upon the ground that the Legislature itself had supreme control over the streets, and had directly granted permission to the companies in question.

The case of State v. Weber, 88 Kan. 175, 127 Pac. 536, 43 L. R. A. (N. S.) 1033, involved the question of the right of individuals to erect poles for the transmission of electricity along a rural highway. The question of the rights of an individual to erect and maintain poles and wires in the streets of a city of the second class was not involved in the case, and could not have been, in view of chapter 121, Laws of Kansas, 1905, passed after the decision in the La Harpe Case, and before the decision in the Weber Case. The court in its decision distinctly recognized the difference between city streets and rural highways and said:

"It is true that cities grant rights and prescribe the conditions upon which individuals and corporations may use the streets for certain purposes, but that does not militate against the view that an individual may use the rural highways for the same purposes without special authority. The power to control the streets has been delegated by the state to the cities under which they may make grants of public rights for public purposes; but where the

power has not been delegated, and the state has prescribed no conditions limiting or regulating the use of the highway, the people are at liberty to use it for travel, transportation, and communication, subject to the condition that such use does not interfere with other lawful uses of the street nor invade the rights of the owners of abutting lands."

A careful consideration of the statutes of Kansas, in the light of the decisions of the Supreme Court of the state, has convinced us that neither corporations nor individuals have had at any time the right to erect or maintain electric light or power wires or poles in the streets of a city of the second class in that state, without the permission of the municipality, and that the Supreme Court will so decide whenever the question is presented to it.

Our conclusion is that in 1910, when the poles and wires were partially destroyed, Williamson had no right to maintain the same in the streets of the city. Their presence there, after request by the city to remove them, constituted a nuisance, and they might be removed by the city authorities. The right of removal, however, would not give the right to wantonly injure or destroy. The rule of damages adopted by the trial court, under the circumstances of the case, was correct, and we see no reason to criticize the amount arrived at.

The judgment and decree of the court below is affirmed.